[No. 28194.   Department One.   May 8, 1941.]

JOHN KULJIS, *as Administrator, Appellant,* v. PETER
XITCO *et al., Respondents.*[1]

*Colvin & Rhodes,* for appellant.

*Skeel, McKelvy, Henke, Evenson & Uhlmann,* for
respondents.

[1]Reported in 113 P. (2d) 26.

MAIN, J.—This action was brought by the administrator of the estate of John Kuljis, Jr., deceased, and recovery was sought for wrongful death. The answer denied liability, and pleaded, separately, three affirmative defenses. The cause was tried to the court and a jury, and resulted in a verdict for the defendants. Motion for new trial was made and overruled, and, from the judgment entered upon the verdict, the plaintiff appeals.

John Kuljis and Jennie Kuljis, his wife, were the parents of John Kuljis, Jr., deceased, upon whom they depended for support. Prior to his death, John Kuljis, Jr., was employed on the power fishing boat St. Patrick, of which the respondents were the owners, and Peter Xitco was the captain thereof. At the time the deceased met his death, the St. Patrick was engaged in purse seine fishing in the Bering Sea, adjacent to the Alaska coast, near the Bear and Sandee rivers.

The deceased and one John J. Evich were members of the crew and were known as "skiff men." When the St. Patrick reached the fishing grounds off shore near the rivers named, it "started into a set." Evich and the deceased got into the skiff. One end of what is referred to as the lead line was tied to the skiff, and the other was attached to the fishing net. They rowed toward the shore, running out the lead line as they went. The St. Patrick started out to sea in the opposite direction, making a circle for the purpose of going around and meeting the skiff near the shore. When the skiff was about an eighth of a mile from the boat, it capsized, and the deceased lost his life. Evich was able to reach the shore. Along the shore line were two bars, some distance apart. The skiff was between these two bars at the time it capsized. The swells of the sea were breaking over the inner bar off shore.

As to what happened at this time is described by Evich in a statement which he made prior to trial and which, by a stipulation of counsel, was read to the jury, Evich not being present. In that statement, he said:

· "When we stopped we saw the breakers breaking about thirty fathoms east over the inside bar. We stood up in the skiff. We are on our own. Each man has a job to do. If there is any question to be decided among the two on the skiff, the man with the most experience decides. This is an unwritten custom. Nobody gives us orders. Both of us in this case were experienced, but I was the most experienced.

"As soon as we quit rowing and looked at the shore, we turned around and looked west in order to get our bearings with relation to the motor-ship and we both saw three tremendous swells just to our stern. Before we had a chance to do anything, the first swell broke on top of us, filled the skiff half full and started to carry us toward shore at a rapid speed."

As the skiff was being driven toward the shore by the swells, the entire lead line ran out, and, when the end was reached, it broke, because there would be a severe jerk and strain upon it at that time.

■ The appellant, by his assignments of error, challenged two instructions given by the court to the jury, the first of which was on contributory negligence, and it is said that it was improper to give this instruction because there is no evidence of any act of the deceased which would amount to contributory negligence. It will be admitted that, if this instruction submitted the matter of contributory negligence to the jury when there was no evidence upon which to base the instruction, it would be prejudicial error. At the time the men in the skiff stopped rowing, the lead line had not all been completely run out. There is evidence from which the jury had a right to find that, when the lead line was not all run out and the skiff was stopped, it was the general practice to tie the lead

line to the skiff so the balance of the line which remained in the bottom of the skiff would not run out. The captain of the boat testified:

"If they don't row it all out generally they tie it [referring to the lead line]."

Further, he said, when asked what happened in this case:

"They just didn't tie anything and when this wave caught them, just run the full length of the lead out and when the wave hit it the strain broke it and half swamped the skiff, all in one operation."

There was evidence that, if the lead line had been tied to the skiff, when the swells hit the skiff, the skiff would not have run toward the shore "at a rapid speed," as the portion of the line which had been run out would operate to steady it and, in a measure, control it. We think, under the evidence to which reference is here made, the question of contributory negligence was one for the jury, and it was not error to give the instruction on that subject.

■ With reference to this instruction, there is the further objection: After correctly defining comparative negligence (the action having been brought under what is referred to as the Jones act, 46 U.S.C.A., § 688), the instruction contains two sentences, given, as it states, by way of illustration. The jury were told that, if they should find that the respondents were ninety per cent negligent and the deceased was ten per cent negligent, then they should reduce the recovery by the appellant by ten per cent; on the other hand, if they found that the respondents were ten per cent negligent and the deceased was ninety per cent negligent, they should reduce their recovery by ninety per cent. While, in this regard, the instruction is technically correct, we think that it would have had

less tendency to mislead or confuse the jury had it contained less extreme percentages. We disapprove of the use of these extreme percentages, but, as already stated, the instruction being technically correct, we would not be justified in this case in reversing the judgment for this reason.

The other instruction complained of was on the matter of assumption of risk. This instruction told the jury that John Kuljis, Jr., was a seaman, that the nature of his calling subjected him to many dangers, and that he assumed the risk of the natural perils of navigation normally incident to his calling, in so far as the same were open, obvious, and apparent. The instruction stated the law correctly.

A seaman assumes the risk normally incident to his calling, but not that of negligent failure to provide a seaworthy ship and safe appliances. *Tampa Interocean S. S. Co. v. Jorgensen,* 93 F. (2d) 927; *The Arizona v. Anelich,* 298 U. S. 110, 80 L. Ed. 1075, 56 S. Ct. 707.

The particular objection to the giving of the instruction was that there was no evidence that the deceased was killed because of the natural perils incident to his calling, for the reason, as the appellant says, that the captain of the boat ordered the skiff men into a place of danger. It will be admitted that, if the captain did that, the men in the skiff would not assume the risk. The evidence as to the condition of the swells at the time was in conflict. There is evidence that they were unusual that morning, and to go out in a skiff was dangerous. There was other evidence that, while there were swells, they were not unusual, and that the weather conditions that morning were favorable to fishing. In addition to this, a number of other fishing boats were operating in the same vicinity. There was also evidence that, when a fishing boat

starts "into a set," every member of the crew has a particular thing to do, and the captain does not give orders with reference thereto. It will be noted that Evich said that, when they were in the skiff, "we are on our own." Whether the skiff men were ordered into a place of danger by the captain or whether they assumed the risk normally incident to their calling was a question for the jury, and it was proper for the court to instruct with reference thereto.

The judgment will be affirmed.

ROBINSON, C. J., STEINERT, BLAKE, and DRIVER, JJ., concur.