[No. 32073. *En Banc.* May 8, 1953.]

CALVIN V. CANTRILL, *Appellant,* v. AMERICAN MAIL LINE,
LTD., *Respondent.*[1]

[1]Reported in 257 P. (2d) 179.

Kennett, McCutcheon & Soderland, for appellant.

Bogle, Bogle & Gates and Robert V. Holland, for respondent.

DONWORTH, J.—Plaintiff brought this action under the Jones act to recover damages (including maintenance and cure) for personal injuries suffered while in the employ of

defendant as a seaman. In its answer, defendant denied any negligence and affirmatively alleged that plaintiff's injuries were the result of a freak wave unexpectedly striking its vessel, an event which could not reasonably have been anticipated and was a risk assumed by seamen in their hazardous calling. A second affirmative defense (relating to maintenance and cure) was that plaintiff was obligated to avail himself of free medical services at the U. S. Marine Hospital in Seattle, and that he failed to do so without proper excuse.

The allegations of the affirmative defenses were denied in the reply, and the case was tried before the court sitting with a jury. A verdict was rendered in favor of defendant. A motion for a new trial having been made and denied, judgment dismissing the action was entered. Plaintiff has appealed.

Appellant was a seaman of approximately twenty years' experience. He first joined the crew of respondent's ship, the "S. S. India Mail," in December, 1948. He had an AB rating (meaning an able bodied seaman), although his duties were those of ship's carpenter. In September, 1949, he signed articles to serve as carpenter aboard this 9,700 ton ship for a voyage from Seattle to the Orient and return. The ship left Seattle at six p. m. on September 2nd, bound for Yokahama and Singapore by way of the great circle route, which passes through the Gulf of Alaska northward toward the Aleutian Islands.

At the time of departure, there was certain gear stored on the tonnage hatch but not lashed thereto. It consisted of canvas, rope, wire, dunnage, and random lengths of lumber. It was the intention of the master that this gear was to have been put ashore in Seattle, but the boatswain (whose duty it was to attend to such matters) did not sign aboard until just before the ship sailed. The watch officer overlooked the failure of the boatswain to put the gear ashore, and it remained aboard after the vessel sailed.

All witnesses who testified on either side relative thereto agreed that it was the universal custom and practice among

seafaring men to secure all loose gear before entering the open sea. To fail to do so would not be good seamanship. As applied to this case, this standard of care required that all loose gear on the deck of the "India Mail" should have been secured before the ship passed Cape Flattery (127 miles from Seattle) on September 3, 1949.

There was a dispute among these expert witnesses concerning the kind of weather to be expected on the great circle route in September. Appellant and the deck maintenance seaman testified that stormy weather might be encountered there at any time of year. The captain testified that usually some of the best weather is encountered there in September. Two other experts testified that the weather in that part of the ocean is unpredictable.

On September 7, 1949, while the vessel was in the Gulf of Alaska, the barometer began to fall. By eight a. m. the wind was blowing between forty and fifty miles per hour, and the ship was taking some spray and "small seas" over the port bow and fore deck. The wind continued to increase, and at eight-thirty a. m. appellant and three other men were ordered by boatswain (acting under orders from the mate) to lash all loose gear on the deck and make certain that it was securely fastened. This work was not ordinarily a part of the carpenter's duties, but he complied with the order of the mate. They started working on the fore deck of the ship.

According to appellant's testimony, they worked for about an hour, when they had become soaking wet from the spray and went inside for about half an hour to dry their clothing. They then resumed work.

There is a dispute in the evidence as to the exact time when appellant was injured. According to the ship's log it was ten-fifteen a. m.; appellant fixed the time as between one-thirty and two p. m.

At the time of the accident, the men were securing the gear on the tonnage hatch, which is near the stern of the ship. The wind was blowing between thirty-eight and fifty miles per hour, and the seas were increasing and spray was

coming over the stern. Suddenly, a large wave washed over the port side of the ship. Appellant was thrown across the deck by the force of the wave, and some loose gear was cast upon him. As a result, he was knocked unconscious and received injuries to his arm, chest, and back, the extent of which was the subject of disputed testimony by medical experts.

The wave which injured appellant was the first one to wash over the deck that day. No further waves were taken aboard until late in the afternoon. This evidence was the basis for respondent's contention that appellant's injuries were caused by a "freak wave," which could not reasonably have been foreseen.

Appellant was laid up in his room for a few days and performed no duties until the ship reached Yokahama. Thereafter, he undertook his duties as carpenter, but the chief mate assigned a man to help him with any heavy work.

Appellant's arm and chest healed in about three weeks, but he continued to have pain in his back and side. When the ship reached Singapore, appellant went to a doctor, who took no X rays and after a cursory examination found nothing wrong with him. The pain continued, and when the ship reached Seattle in February, 1950, appellant went to the marine hospital for treatment. X rays were taken, but the doctor refused to operate and no treatment was given. Appellant returned to the hospital three times at respondent's instigation. The last time, the doctor in charge gave appellant a sealed envelope and told him to deliver it to respondent. Respondent's claim agent read the report and told appellant that the doctors at the hospital could not discover anything the matter with him.

About three months after leaving the "India Mail," appellant found an easier job on a ship sailing between Seattle and Alaska. He remained with this ship from June to September, 1950. During this period, the pain in his back and under his ribs became unbearable, and when he was in Seattle between trips he went to his family doctor about ten times for shots to deaden the pain. At first, these gave

him adequate temporary relief, but gradually they became less effective, and appellant was referred by his family doctor to an orthopedic surgeon. The latter recommended an operation on the spine, which was performed on October 20, 1950. Appellant was in the hospital for ten days and then was confined to his bed at home for another month.

Appellant was able to return to work in May, 1951, and for brief periods he performed light work on two other ships. Since September, 1951, he has been unable to work. At the time of the trial, the mobility of his back was reduced fifty per cent and he was in constant pain. He has been advised that if he continues to work as a seaman another operation may be necessary to fuse the remainder of his lower spine, in which case he would be one hundred per cent disabled.

We have set forth appellant's injuries in some detail, because the testimony relative thereto has a bearing not only upon the issue of the amount of general damages claimed by him but also upon his right to maintenance and cure under maritime law. This right exists even in the absence of negligence upon respondent's part in causing appellant's injury if he acted in good faith in not availing himself of the free medical services at the marine hospital.

In prosecuting this appeal, appellant relies on seventeen assignments of error, which we will now consider in the order in which they are discussed in his brief.

Appellant's first assignment of error is that the trial court erred in not holding as a matter of law that respondent was liable for the injuries sustained by him and in not so instructing the jury (as requested in his instruction No. 2). He contends that the evidence conclusively showed that respondent had violated the standard of care required of all operators of ships when, prior to entering the open sea, it failed to secure all loose objects on the vessel against severe storms which respondent knew, or should have known, would be encountered on this voyage.

A shipowner is held to a reasonable standard of care in securing loose objects on the deck of the vessel so

that they will not cause injury to employee-seamen by being thrown about the deck by the force of the wind, seas or the motion of the vessel. Evidence of the usual custom of seamen to securely lash all loose gear before entering the high seas is competent to show what constitutes a reasonable standard of care. Whether the standard had been violated in this case depended upon all the facts and circumstances. ·

In this case, the testimony was conflicting as to whether the gear on the tonnage hatch had been secured before the accident to withstand the force of any weather which could reasonably have been expected at that time and place. Since, under the evidence, reasonable men could differ as to whether respondent had complied with the standard of reasonable care above referred to, it was not error to submit to the jury the issue as to respondent's negligence and whether it was a proximate cause of appellant's injuries.

Appellant attacks respondent's first affirmative defense, which alleged that his injuries were proximately caused by "a sudden freak wave" which struck the ship. It was further alleged that this event could not have been reasonably anticipated, and that it was a risk assumed by seamen in their hazardous calling. (We will discuss the assumption of risk defense later in this opinion.)

Concerning the freak wave defense, appellant states in his brief:

"It should at all times be remembered that the witnesses in this case who were possessed of maritime knowledge, repudiated the 'freak wave' theory. In fact, an examination of this and other cases demonstrates that the term is practically unknown except where it has been used as a weapon of defense to avoid a shipowner's liability. See *Ludwig v. United States* (Dist. Ct., Wash., 1948) 74 F. Supp. 29, at p. 30."

In support of his argument that there is no such thing as a freak wave, appellant also cites *Menefee v. W. R. Chamberlin Co.* (C.C.A. 9), 176 F. (2d) 828, where a ship's officers failed to cause a hawser to be secured for twenty-two days

after the ship left Olympia on an ocean voyage. A seaman was injured during an attempt to stow the hawser when a large wave swept over the deck and threw him against the ship's structure. The court, in holding the ship's operator liable, said:

"This delay of 22 days to stow the hawser is clearly negligent management of the vessel's equipment. The negligence continued and was existing when appellant was injured. If not *the* proximate cause, the captain's and mate's delay until it was necessary to expose appellant to such an expected hazard was *a* proximate cause of his injury within the Jones Act provision 45 U. S. C. A. § 51 that:

" 'Every common carrier . . . shall be liable in damages to any person suffering injury . . . *resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier. . . .*' (Emphasis supplied.)"

In the present case, the issue tendered by respondent's first affirmative defense was whether, under the weather conditions existing at the time and place in question, the coming of this wave over the deck should have been reasonably anticipated by respondent and, if so, whether its failure to anticipate this event was a proximate cause of appellant's injuries. There being conflicting testimony as to this issue, the trial court did not err in refusing to give appellant's requested instruction No. 2 declaring respondent liable as a matter of law.

Appellant next contends that the trial court erred in failing to sustain appellant's challenge to the sufficiency of respondent's proof under its second affirmative defense relating to maintenance and cure (which amounted to $1,307.94), and also in refusing to give appellant's proposed instruction No. 12 on this subject.

Appellant was entitled to free medical treatment at the U. S. Marine Hospital in Seattle, Washington. It was his duty to endeavor to obtain such treatment there. However, if he made a *bona fide* attempt to avail himself of the treatment afforded by the hospital and was unable to obtain proper treatment for his injuries there, he had a right to seek appropriate treatment elsewhere and to recover from

the owners of his vessel the expense thereof. *Van Camp Sea Food Co. v. Nordyke,* 140 F. (2d) 902. (Certiorari denied 322 U. S. 760, 88 L. Ed. 1587, 64 S. Ct. 1278.)

We believe that the evidence relating to the availability of proper medical treatment at the marine hospital and appellant's good faith in seeking medical treatment elsewhere was in dispute and created an issue which should have been submitted to the jury. Appellant's proposed instruction No. 12 was correct as far as it went, but should have included language specifically charging the jury that the determination of this issue was not connected in any way with the issue of whether respondent's negligence, if any, was the proximate cause of appellant's injuries.

Since a new trial must be granted because of certain errors in some of the instructions given by the court relating to the principal issue (hereinafter pointed out), we think that upon a retrial the jury should be carefully instructed in accordance with the views expressed herein regarding this separate issue as to appellant's right to maintenance and cure.

In assignments of error Nos. 4, 6, 7, 10, and 11, appellant complains that the trial court erred in giving instructions Nos. 3, 5, 11, 14, and 15. In short, he contends that these instructions when read together are inconsistent, confused, argumentative, and slanted in respondent's favor.

After carefully reading the instructions in question, we do not believe that they are inconsistent, confused, or argumentative. Read together with instruction No. 2 (to which appellant did not object), these five instructions tend to emphasize respondent's theory of the case and *pro tanto* tend to make less prominent appellant's theory. While each party is entitled to have his theory of a case presented in instructions to the jury, it is within the discretion of the trial court to determine how many instructions should be given regarding each litigant's theory of the case. The five instructions here attacked contain correct statements of the legal principles involved, and, with the exception of No. 14 (discussed below), no reversible error can be predicated upon them.

We think the use of the words "mere fact" in No. 2 (not excepted to) and in No. 3, and of the words "mere accident" in No. 11, tends to belittle appellant's position in the case in the eyes of the jury. We, therefore, deem it proper to suggest that the word "mere" be omitted from these or similar instructions upon a retrial of this case in order to avoid any question as to the impartiality of the instructions as a whole.

■ Appellant also contends that instruction No. 11 was improper because it stressed the possibility that appellant's injuries might be found to have been caused by an unavoidable accident. The jury was told in this instruction that they must find for respondent if they found that what happened was a mere accident which was unavoidable and not proximately caused by any negligence upon its part. Whether such an instruction is proper, depends upon the evidence. If facts are presented in the case which bear on the issue of unavoidable accident, such an instruction is proper. *Webb v. Seattle*, 22 Wn. (2d) 596, 157 P. (2d) 312, 158 A. L. R. 810, and cases cited.

In the instant case, the jury could have found from the evidence presented that respondent was not guilty of negligent conduct which was a proximate cause of appellant's injuries, and that the cause thereof was a large wave which could not have reasonably been anticipated. We, therefore, conclude that there was no prejudicial error in giving instruction No. 11 (omitting the word "mere" as suggested above).

■ Appellant's next contention (assignments Nos. 8 and 10) is that the issue of a "freak wave" should not have been left to the jury, and further that, in submitting that issue, the court gave inconsistent instructions thereon. We feel that there was sufficient evidence as to the lack of foreseeability of such a wave coming over the stern at the time and place in question to warrant submitting the issue to the jury. However, we agree with appellant that the instructions given (Nos. 12 and 14) were inconsistent and confusing.

In the first paragraph of instruction No. 12 (which was requested by appellant after the court decided to submit

the question to the jury), the trial court correctly defined a "freak wave." The second paragraph read:

"You are further instructed that if you find, by a preponderance of the evidence, that defendant, prior to plaintiff's injury, was guilty of negligence in failing to secure various items on the deck over the tonnage hatch of the vessel, and that such negligence was a proximate cause of plaintiff's injury, defendant would be liable to plaintiff regardless of whether said wave was a freak wave."

Instruction No. 14 read:

"You are instructed that if you find by a preponderance of the evidence that the injury to the plaintiff was *due to* a freak wave which washed over the stern of the SS India Mail on September 7, 1949 and which the Master could not have reasonably anticipated nor guarded against, your verdict should be for the defendant." (Italics ours.)

The quoted portion of instruction No. 12 correctly states the applicable law. Instruction No. 14 was inconsistent with it and could only tend to confuse the jury, because it allowed them to find for respondent even though they should find that respondent was negligent and that its negligence was a proximate cause of the injury.

Appellant next claims error (assignments Nos. 5, 12, 13 & 15) in the giving of instruction No. 4 and in failing to give three of appellant's requested instructions (Nos. 9, 14 & 21). The jury was told that the seaman "assumes" the loss if injured in one of the normal hazards of the business without fault on the part of anyone. The court refused to instruct that the seaman did not "assume" the risk of the employer's negligence, that the doctrine of assumption of the risk has no application in seamen cases, and that a seaman is subject to vigorous discipline at sea and must accept working conditions as commanded by his superior officers.

The importance of this question requires us to review some of the pertinent decisions of the U. S. supreme court and of the circuit courts of appeal, because their interpretation of the Jones act is controlling in this case.

The doctrine of assumption of risk as applicable here is controlled by the 1939 amendment to the Federal employers'

liability act, 53 Stat. 1404, 45 U. S. C. A. § 54. The Jones act incorporates this amendment in it. The pertinent section, with the amended portion italicized, reads:

"That in any action brought against any common carrier under or by virtue of any of the provisions of this chapter to recover damages for injuries to, or the death of, any of its employees, such employee shall not be held to have assumed the risks of his employment in any case *where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier; and no employee shall be held to have assumed the risks of his employment in any case* where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."

This amendment was thoroughly construed by the supreme court of the United States in *Tiller v. Atlantic Coast Line R. Co.*, 318 U. S. 54, 87 L. Ed. 610, 63 S. Ct. 444, 143 A. L. R. 967. In that case, the circuit court of appeals had attempted to distinguish between "assumption of the risk as a defense by employers against the consequences of their own negligence, and assumption of the risk as negating any conclusion that negligence existed at all." In reversing the case, the supreme court said:

"We hold that every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment, and that Congress, by abolishing the defense of assumption of risk in that statute, did not mean to leave open the identical defense for the master by changing its name to 'non-negligence.' . . .

"The result is an Act which requires cases tried under the Federal Act to be handled as though no doctrine of assumption of risk had ever existed. . . .

"The doctrine of assumption [*sic*] risk can not be 'abolished in toto' and still remain in partial existence as the court below suggests. The theory that a servant is completely barred from recovery for injury resulting from his master's negligence, which legislatures have sought to eliminate in all its various forms of contributory negligence, the fellow servant rule, and assumption of risk, must not, contrary to the will of Congress, be allowed recrudescence under any other label in the common law lexicon. The Act of 1908 and

the amendment of 1939 abolish the post-*Priestley v. Fowler* defenses and authorize comparison of negligence instead of barring the employee from all recovery because of contributory negligence. They leave for practical purposes only the question of whether the carrier was negligent and whether that negligence was the proximate cause of the injury."

Respondent relies on the concurring opinion of Mr. Justice Frankfurter in the *Tiller* case, and the cases of *Owens v. Union Pac. R. Co.*, 319 U. S. 715, 87 L. Ed. 1683, 63 S. Ct. 1271; and *Roberts v. United Fisheries Vessels Co.*, 141 F. (2d) 288, to support its position that assumption of risk is precluded only where the negligence of the employer is established as the cause of the injury, and that an employee assumes the risk of normal hazards of his occupation which the employer in the exercise of due care could not avoid.

Mr. Justice Frankfurter's language in his concurring opinion of the *Tiller* case is inconsistent with the statement of Mr. Justice Black, speaking for the majority, that "every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment."

The language of the *Owens* case, *supra*, relied on by respondent, is not in point. In that case, the accident to the workman occurred prior to the effective date of the 1939 amendment, and the court was not interpreting the law as it now exists. *Chicago Great Western R. Co. v. Peeler*, 140 F. (2d) 865.

In the *Roberts* case, *supra*, plaintiff's intestates were seamen on defendant's fishing boat. They were lost in a storm when defendant failed to order their dory back to the fishing boat when stormy weather began to close in. The trial judge charged the jury that an employee assumes the risks obvious and well known in that type of occupation, but further stated that "he, of course, does not assume that anyone is going to be negligent or anyone is going to disregard the duties that are owed to him."

The jury returned a verdict for defendant. The circuit court of appeals for the first circuit affirmed the decision. Certiorari was denied by the United States supreme court. *Roberts v. United Fisheries Vessels Co.*, 323 U. S. 753, 89

L. Ed. 603, 65 S. Ct. 81. Respondent contends that the *Roberts* case is controlling, and that the denial of certiorari impliedly modified the holding of the *Tiller* case, *supra*, at least to some extent. We do not agree. See opinion of Mr. Justice Frankfurter in *Maryland v. Baltimore Radio Show*, 338 U. S. 912, 94 L. Ed. 562, 70 S. Ct. 252.

In discussing the same question, the Michigan supreme court in *Heeb v. New York Central R. Co.*, 325 Mich. 490, 498, 39 N. W. (2d) 44, 47, said:

"We do not think such claim well founded. As pointed out in the opinion in the *Roberts case*, the controlling issue was whether the defendant was negligent. It having been determined that defendant had not failed in the observance of any duty owing by it for the safety of plaintiff's intestates, recovery was denied."

*Perrett v. Southern Pacific Co.*, 73 Cal. App. (2d) 30, 165 P. (2d) 751, which was brought under the Federal employers' liability act, is similar to the instant case. The charge of negligence upon which the cause was tried was that plaintiff was thrown from a freight car, while in the course of his employment, as a result of the negligent operation of the train by employees of defendant. Verdict was for defendant. Plaintiff appealed on the ground that certain instructions given by the trial court dealing with assumption of risk were prejudicially erroneous.

In reversing the judgment of the lower court, the district court of appeal said:

"The respondent's argument in this case amounts to re-arguing the *Tiller* case, and reiterates the arguments advanced by Mr. Justice Frankfurter. There can be no doubt but that under the majority opinion it is error of a most serious nature to interject into a case, since 1939, the doctrine of assumption of risk, however disguised. There can be no doubt that since 1939 an employee cannot recover unless he pleads and proves negligence on the part of the employer. There can be no doubt that before and since 1939 the employer was and is not liable if the cause of injury is some hazard of the employment that reasonable care could not have protected against. While it may be generally true, therefore, that the employee 'assumes' the risk of hazards not due to the employer's negligence, that does not

mean that the jury should be so instructed. Even Mr. Justice Frankfurter recognized that the phrase 'assumption of risk' is a highly ambiguous one, and that its use in instructions 'is bound to create confusion,' and that 'it should therefore be discarded.' That this is so seems obvious. The issues before the jury are whether the defendant was negligent, and whether such negligence proximately caused the injury. The mere fact that the risk was an ordinary or usual one is a false factor. As already pointed out, the real question is whether the risk to which the employee is subjected could be eliminated in the exercise of ordinary care. To interject into the case the thought that the employee assumes the risks of usual and ordinary dangers cannot help but confuse what otherwise would be a simple issue. When the jury is told that defendant can be held liable only upon proof of negligence, the defendant has received all of the protection to which it is entitled."

To the same effect, see *Medlin v. Powell*, 229 N. C. 323, 49 S. E. (2d) 618, and *Heeb v. New York Central R. Co.,* *supra.*

 This court is bound by the majority decision in the *Tiller* case, *supra*, on the question of assumption of risk, and must hold that the trial court erred giving instruction No. 4, and that this error alone requires a retrial of this case. It is to be noted that our two prior decisions (*Kuljis v. Xitco*, 8 Wn. (2d) 606, 113 P. (2d) 26, and *Pierce v. Spokane International R. Co.*, 15 Wn. (2d) 431, 131 P. (2d) 139), dealing with assumption of risk under the Federal employers' liability act, were decided prior to the *Tiller* case decision of the United States supreme court and are, therefore, no longer applicable.

 The court also erred in failing to instruct the jury (as requested in appellant's proposed instruction No. 21) that a seaman is subject to the rigorous discipline of the sea and must obey orders of his superiors. See Title 46 U. S. C. A. § 701, prescribing penalties for disobedience to orders. One of the four issues of negligence submitted to the jury was whether or not the officers of respondent's vessel used due care in ordering appellant out on the deck to secure the gear under the circumstances then prevailing. The jury should, therefore, have been advised that appel-

lant must obey the orders of his superiors and could not have decided for himself whether or not·it was safe to obey them. *Combs v. United States*, 73 F. Supp. 665; *Darlington v. National Bulk Carriers*, 157 F. (2d) 817.

■ As to assignments of error Nos. 9 and 16, in which appellant complains that the ship's officers were permitted to testify to their conclusions regarding ultimate questions which the jury was called upon to decide, we are of the opinion that these witnesses were qualified as experts and were properly permitted to give opinion testimony regarding the effect of weather conditions. The objection that they could not testify as to the ultimate question before the jury, is not well taken. See 7 Wigmore on Evidence (3d ed.) § 1921, and *Lynch v. Republic Publishing Co.*, 40 Wn. (2d) 379, 243 P. (2d) 636.

Appellant next contends (assignment No. 17) that those portions of the medical record of appellant which antedated the tenure of the medical librarian and the doctor in charge of out-patient treatment at the marine hospital in Seattle, Washington, were improperly admitted in evidence.

The determination of this question requires a construction of the uniform business records as evidence act, RCW 5.44.100 *et seq.* (*cf.* Rem. Supp. 1947, § 1263-1).

RCW 5.44.110 reads:

"A record of an act, condition, or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition, or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

Dr. Hardy testified that he was stationed in the marine hospital from June 1, 1949, until October 1, 1951, and had charge of the out-patient clinic and technical custody of the records. He identified the records, the mode of their preparation, the fact that they were kept in the regular course of business and were prepared at or near the time the patient was examined or treated. Miss Ross testified that

she had been employed as medical records librarian at the hospital for one month prior to the date of trial. She identified the medical records as those of appellant.

At the trial, appellant's objection to the admission of these records in evidence was on the ground that the entries which were made prior to the accident on September 7, 1949, were not relevant to the issues, and further that those entries which were made prior to June 1, 1949, were not shown by a witness with actual knowledge to have been made in the usual course of business or at or near the time that the act, condition, or event in question took place.

■■■ Appellant testified that he had always been in good health, had not lost more than ten pounds of weight at any time in the last ten years, and did not develop a pain in his side until after the accident. Dr. Hardy testified that, when appellant came to see him the first time after the accident on February 13, 1950, he related a history of pain in the side and back, weight loss, and other symptoms suggestive of an ulcer. The trial judge ruled that those portions of the hospital record relating to the previous weight loss of twenty-two pounds and the ulcer condition were relevant as tending to show that some of the things complained of actually existed prior to the accident. This ruling was correct. See *Gallagher v. Portland Traction Co.*, 181 Ore. 385, 182 P. (2d) 354, where plaintiff's hospital record for a fifteen-year period beginning long before the accident was admitted to show prior physical condition and to refute her testimony.

■■■ Appellant next contends that, since no person who prepared the hospital record prior to the accident identified the record, that portion antedating the accident was inadmissible as hearsay.

The uniform act was passed by the legislature for the purpose (among others) of making evidence that would otherwise be hearsay competent evidence. Where (as here) the trial court is satisfied that sufficient testimony has been adduced regarding the manner in which certain records have been kept, and that their identity has been properly established in compliance with the act, no objection on the

ground of hearsay can be entertained. As applied to hospital records, compliance with the act obviates the necessity, expense, inconvenience, and sometimes impossibility of calling as witnesses the attendants, nurses, physicians, X ray technicians, laboratory and other hospital employees who collaborated to make the hospital record of the patient. *Weis v. Weis*, 147 Ohio 416, 72 N. E. (2d) 245, 169 A. L. R. 668. It is not necessary to examine the person who actually created the record so long as it is produced by one who has the custody of the record as a regular part of his work or has supervision of its creation. *Green v. Cleveland*, 79 N. E. (2d) (Ohio) 676.

In this state, the ruling of the trial judge in admitting or excluding such records is given much weight and will not be reversed unless there has been a manifest abuse of discretion. See *Choate v. Robertson*, 31 Wn. (2d) 118, 195 P. (2d) 630; *State v. Meyer*, 37 Wn. (2d) 759, 226 P. (2d) 204; *Morrison v. Nelson*, 38 Wn. (2d) 649, 231 P. (2d) 335. Here there was no abuse of discretion and the evidence was properly admitted.

The last assignment of error discussed in appellant's brief (No. 14) complains of the failure of the trial court to give proposed instruction No. 17, which was requested by appellant. This instruction would have told the jury that, if they found that a natural hazard of the sea and the negligence of the shipowner concurred, each proximately causing a seaman's injuries, the shipowner would be liable even though there would have been no liability resulting solely from the natural cause. This matter was partially covered by instruction No. 12, in which the jury were told that, if respondent was negligent in failing to secure the loose gear, then plaintiff could recover in spite of the "freak wave."

However, three other theories of respondent's negligence were submitted to the jury in instruction No. 1. Consequently, the jury should have been instructed that, if they found respondent negligent in any one of the four respects mentioned in instruction No. 1, and that such negligence

was a proximate cause of the injury, then respondent would be liable even though such negligence concurred with a natural hazard of the sea. Upon a retrial of this case, instruction No. 12 should be amplified in the respect herein noted.

The trial of this case, as well as this appeal, involved several difficult and complex issues of law. Both this court and the trial court are bound to apply the Jones act (as construed by the supreme court of the United States) to the facts of this case. The principal error which compels a reversal of the judgment entered on the verdict is the trial court's instruction on the assumption of risk, a doctrine which was completely obliterated by the 1939 amendment to the Jones act.

We are compelled by the decision in the *Tiller* case, *supra*, to conclude that, because of this (as well as the other errors noted above), the judgment must be reversed and the case remanded with instructions to grant appellant a new trial to be conducted in accordance with the views expressed herein.

It is so ordered.

ALL CONCUR.