[No. 34843.  *En Banc.*  March 3, 1960.]

THOMAS BARRACLIFF, *Appellant*, v. MARITIME OVERSEAS CORPORATION, *Respondent*.[1]

[1]Reported in 349 P. (2d) 1080.

*Greive & Law* (*R. R. Bob Greive* and *Roderick D. Dimoff*, of counsel), for appellant.

*Summers, Bucey & Howard, Theodore A. LeGros*, and *Richard W. Buchanan*, for respondent.

HILL, J.—This is an appeal from a judgment of dismissal based on a verdict for the shipowner in an action by a seaman for alleged injury, *i.e.*, a strain or other traumatic event, which was predicated on negligence under the Jones

act; and breach of the maritime law warranty of seaworthiness. It is urged that the action was also for injury due to a lack of proper medical care for which the seaman was entitled to recover, even if the condition for which he sought medical care was due to natural causes and not to any physical injury which occurred on board the ship, and that this phase of the case was never properly presented to the jury.

The plaintiff, Thomas Barracliff, sixty years of age, was a fireman and watertender aboard the SS Ocean Rose, owned by the defendant, Maritime Overseas Corporation.

As the ship was traveling north from the Canal Zone to San Pedro, California, the plaintiff undertook, as one of his duties, to trim the fireroom ventilators, and allegedly strained himself in so doing. There was testimony that these ventilators could not be adjusted from the fireroom by a reach rod, as was customarily done, but had to be trimmed from the top deck by hand with the aid of a thirty-six inch stillson wrench. There was testimony that some reach rods were disconnected; that the turning gear of the ventilators was in a bad state of repair due to rust, corrosion, lack of proper lubrication, and some broken castings. It was further testified that this condition had been called to the attention of the chief engineer on numerous occasions. There was also opposing testimony that the turning mechanism of the ventilators was in excellent condition—well oiled and greased, and could be operated with the greatest of ease.

The plaintiff testified that this strain occurred between 5:30 and 6:00 p. m., Friday, June 15, 1956; and that he first felt a sharp pain when he returned from the top deck to his station in the fire room or engine room. (On this type of vessel it is one large room.) He later reported to the chief mate, the ship's medical officer (there being no doctor aboard), and complained of fever, shortness of breath, headache, decrease of urine, and pain in the small of the back and in the urinal tract.

The chief mate observed as symptoms: a high pulse, temperature and respiration; a wet clammy skin; and a

swollen right testicle. The plaintiff was taken off duty for the remainder of the voyage, and was instructed to record all of his liquid intake and output. After three days of rest, the chief mate noted that all of the symptoms had subsided; the plaintiff, however, complained of continued difficulty and pain in urination. It is his contention that during his last five days aboard ship there was no substantial voiding of urine, just a drop now and then, and intense pain.

It was seven days from the time of the alleged injury until the ship reached San Pedro, Friday, June 22nd. The plaintiff was immediately taken to the clinic maintained there by the United States public health service. On Monday, June 25th, he was referred by the clinic to the public health service hospital at San Francisco, where, for reasons personal to himself, he did not arrive until Friday, June 29th.

The medical theory of plaintiff's case is that the strain, caused by trimming a ventilator with its rusted and corroded turning gear, caused internal injuries which included an enlargement of his prostate gland; that this enlargement obstructed any substantial passing of urine; that the resultant urinary retention created a uremic poisoning which affected the eighth cranial (hearing) nerve; and that extensive and permanent deafness and other complications have resulted. (Or, if he did not sustain any strain, he was not given proper treatment for the urinary retention irrespective of what may have been the cause of the retention, and deafness and other complications resulted therefrom.) There is sufficient medical testimony to support the alternative theories.

A transurethral resection was done upon the plaintiff at the public health service hospital in order to clear the obstructed passage through the prostate. Urinary retention and uremic poisoning were also noted by medical examiners, and the plaintiff was catheterized on at least two occasions to drain retained urine from the bladder. It also appears that plaintiff's hearing was less than that which is considered adequate for ordinary social purposes.

Upon trial of this action the verdict was for the defendant. In a special interrogatory the jury was asked: "Was the

plaintiff injured while serving as a member of the crew of the SS Ocean Rose?" The jury answered, "No."

It is certain that the jury did not accept the first link in the plaintiff's chain of causation on the hypothesis that there was a severe strain which resulted from his efforts to trim the ventilator. Whether in answering the interrogatory the jury also considered injury as the result of inadequate or improper medical care will be hereafter considered.

The defendant's theory of the case, which the jury does appear to have accepted, is that the plaintiff's disorders were the result of a long-standing prostate condition which manifested itself aboard the ship as the outgrowth of completely natural causes and which was not aggravated by anything which occurred aboard the ship; and that the medical care given was sufficient and proper under the circumstances.

There was ample evidence to support this theory. The chief mate noted that when the plaintiff first reported for duty aboard the ship he was overweight and with "a bloated abdomen in both upper & lower regions." The plaintiff was diagnosed, in the hospital, as having had enlargement and chronic infection of the prostate gland which antedated his service aboard the ship; his medical witness testified that the plaintiff's urinary retention could have developed with or without any particular strain or other traumatic event.

We see no reason to interfere with the jury's determination, on conflicting testimony, that the plaintiff was not injured while serving as a member of the crew of the SS Ocean Rose, if the jury was properly instructed on the issues related to that question; and we turn now to a consideration of the assignments of error dealing with instructions.

The trial court, by instruction No. 4, adequately defined negligence in general terms, and said that

" 'Unseaworthiness' exists whenever the vessel itself or its appliances, appurtenances or places of work are not reasonably safe or adequate for the purposes for which they are intended or ordinarily used. The term 'appliances'

would include ventilators and ventilator turning gear. A vessel that is reasonably fit for the voyage or the work for which it is intended is 'seaworthy'."

The only exception to this instruction was to the inclusion of the last quoted sentence. That the sentence complained about, standing alone, would be misleading, is made clear by a recent decision of the United States supreme court. In *McAllister v. Magnolia Petroleum Co.* (1958), 357 U. S. 221, 2 L. Ed. (2d) 1272, 78 S. Ct. 1201, a member of a ship's crew had injured his back when he slipped and fell down a stairway leading from the lounge to the galley. It was alleged that (p. 222),

" . . . the portholes and deck at the head of the stairs were not watertight, that they allowed water to accumulate on the stairs, and that this condition was the proximate cause of his fall. . . . "

The jury made negative findings on unseaworthiness and negligence. The trial court had instructed (p. 227),

" ' . . . that the term 'unseaworthy,' as used herein, means that a vessel with its appliances and fittings is not reasonably fit for the purposes for which it is being used.' "

In directing a new trial, the supreme court said that the instruction (p. 227)

" . . . carried the incorrect implication that petitioner could recover for unseaworthiness only if the defect was of such quality that it rendered the whole vessel unfit for the purpose for which it was intended. It is well settled that 'the vessel and owner are liable to indemnify a seaman for injury caused by unseaworthiness of the vessel or its appurtenant appliances and equipment. . . . ' *Mahnich v. Southern S. S. Co.*, 321 U. S. 96, 99."

█ We are satisfied that the instruction in this case made clear the distinction the supreme court had in mind in the *McAllister* case, *supra*. The instruction criticized, in that case, referred to the "vessel with its appliances and fittings." The instruction, in this case, makes it clear that if the "vessel itself *or* its appliances, appurtenances, or places of work" are not reasonably safe and adequate for the purposes intended, the vessel is unseaworthy. It then

specifically states that the ventilator and ventilator turning gear, of which the plaintiff complains, are included in the term "appliances." (Italics ours.)

In any event, we are not concerned with a finding on the issue of unseaworthiness in this case, because the jury was instructed,

"In addition to your verdict in this case, you will answer the following interrogatories:

"INTERROGATORY No. 1:

"Was the plaintiff injured while serving as a member of the crew of the SS OCEAN ROSE?

"ANSWER: —————— ('Yes' or 'No')

"If your answer to the above interrogatory is 'no', you need not answer the following interrogatories. If your answer is 'yes', you will then answer the following:

"INTERROGATORY No. 2:

"Was the injury to the plaintiff occasioned by the negligence of the defendant, or by reason of the vessel being unseaworthy, or both?

"ANSWER: —————— ('Yes' or 'No')."

(The other four interrogatories had to do with damages, if both interrogatories 1 and 2 were answered affirmatively.)

■ The jury having answered "no" to the first interrogatory, i.e., that the plaintiff was not injured while serving as a member of the crew of the SS Ocean Rose, there was no necessity to determine causation. There was no exception to this instruction.

■ Another assignment of error relates to the failure to give the plaintiff's requested instructions Nos. 7, 12, and/or 13. Instruction No. 4 says all that needs to be said with reference to the subject matter of these requested instructions, and they would have served only to undergird arguments, which the plaintiff's attorneys were free to, and doubtless did, make to the jury. We have but recently indicated that pinpointed or spotlighted instructions are not necessary where adequate general instructions are given. *McDonald v. Spokane County* (1959), 53 Wn. (2d) 685, 336 P. (2d) 127; *Arnold v. United States Gypsum Co.* (1954), 44 Wn. (2d) 412, 267 P. (2d) 689.

One other requested instruction (No. 4) should be con-

sidered on the presentation of the issue of seaworthiness. The trial court gave the following instruction:

"You are instructed that the laws of the United States with respect to the keeping of adequate medicine chests is as follows:

" 'Every vessel belonging to a citizen of the United States, bound from a port in the United States to any foreign port, or being of the burden of seventy-five tons or upward, and bound from a port on the Atlantic to a port on the Pacific, or vice versa, shall be provided with a chest of medicines';

"You are further instructed that failure to keep a medicine chest adequately provided renders a vessel unseaworthy under the maritime law."

█ The plaintiff's requested instruction No. 4 would have told the jury that unless the ship had a catheter in its medicine chest it was unseaworthy. As we read the evidence, there is nothing definite either way on whether there was or was not a catheter aboard ship. A catheter is a tubular instrument which can be introduced into the bladder through the urethra to draw off the urine. If carried on board ship and used for the plaintiff's benefit, it could have given temporary relief from plaintiff's urinary retention. A qualified urologist testified, however, that use of a catheter by medically unskilled personnel could do more harm than good. With this testimony in the record, it would have been error to have given the requested instruction.

It is apparent, too, that this claimed "unseaworthiness" had nothing to do with whether the plaintiff strained or injured himself in trimming the ventilator. It had to do only with the facilities for treatment after he put himself in the care of the ship's acting medical officer.

█ Other assignments of error relating to instructions on the strain, or other trauma, phase of the case, as distinguished from lack of proper medical care and attention, are without merit. The substance of requested instruction No. 21 was covered by instruction No. 6. The claim of error as to instruction No. 17, which submitted the interrogatories to the jury, cannot be considered here because there was

no objection or exception to that instruction at the trial court level. See *Palmer v. Waterman S. S. Corp.* (1958), 52 Wn. (2d) 604, 328 P. (2d) 169; *Peerless Food Products Co. v. Barrows* (1957), 49 Wn. (2d) 879, 307 P. (2d) 882; *Harris v. Holroyd* (1949), 33 Wn. (2d) 915, 207 P. (2d) 765.

There remains the claim that the action, insofar as it was based on a lack of proper medical care, was not properly presented to the jury. This is assuming the condition which caused the plaintiff to report to the ship's medical officer to be the result of natural causes rather than any incident connected with his service on board the vessel.

The trial court properly instructed as to the standard of care which the defendant owed to the plaintiff, with reference to his treatment and care, in these words (instruction No. 9):

"You are instructed that the degree of treatment and care which the vessel (through the master and the officers acting for her) owes to the seaman is the exercise of reasonable care to furnish such aid and assistance as ordinarily prudent persons would under similar circumstances."

The only exception to this instruction was that there should be added to it an instruction

". . . that if a radio message to the Coast Guard is feasible, the owner is liable for failure to contact the Coast Guard in the rendering of adequate medical assistance."

The plaintiff requested an instruction (No. 5) to the same effect, relating to defendant's obligation to avail itself of medical advice available through the coast guard; and requested an instruction (No. 3) relating to the defendant's obligation to avail itself of the coast guard's ship-to-shore evacuation service.

These instructions served no purpose but to buttress arguments to the jury as to what constituted the duty of reasonable care, which the trial court had already covered in its general instruction heretofore quoted. Whether, under the circumstances, the defendant had any duty to contact the coast guard was for the jury to determine.

The trial court's instruction No. 11 is assigned as error. It told the jury that the presence of a United States

public health service hospital or clinic, accessible to the seaman, terminated the shipowner's duty to furnish further medical aid and care. The plaintiff's objection is that the shipowner must actually deliver the seaman to the hospital or clinic before its duties are terminated. The objection is completely immaterial in this case; the plaintiff's own testimony is that he was delivered to the clinic immediately upon the ship's arrival at San Pedro.

Before taking up a final assignment of error dealing with the admission of evidence, we should summarize our position with reference to the interrogatory and the verdict, and the instructions.

█ If the jury interpreted the word "injured," as used in the interrogatory "was the plaintiff injured while serving as a member of the crew of the SS Ocean Rose," to include not only the consequences of any strain or trauma sustained while trimming a ventilator, but also the consequences of inadequate or improper medical care aboard ship, the jury's answer and verdict is consistent with the evidence and the instructions.

The only circumstances under which the plaintiff has not had a full consideration of all of his claims and contentions is the possibility that in answering the interrogatory the jury did not interpret the word "injured" to include the consequences of inadequate, improper, or negligent medical care aboard ship. Even so, the special verdict was still consistent with the evidence and with the general verdict; in such case, the only difference is that the special interrogatory should not have been decisive of the whole case.

Instruction No. 17 submitted six interrogatories, and from the answers it could be determined what damages the plaintiff had sustained for which the defendant was liable; but after the first interrogatory, which we have twice quoted, the jury was instructed, "If your answer to the above interrogatory is 'no', you need not answer the following interrogatories."

█ As we have heretofore indicated, the plaintiff took no exceptions to this instruction. If he thought that there

was danger that the jury would, as he now urges, put too narrow an interpretation on the word "injured," it was necessary that he so advise the trial court and except to the instruction, or propose a clarification. Not having given the trial court an opportunity to correct or clarify the instruction, there is no basis for intervention by this court.

There remains for consideration one assignment relating to the admissibility of evidence.

The plaintiff endeavored to show that his hearing had been good until he experienced the alleged strain and the alleged breach of duty with reference to treatment heretofore discussed. Evidence was introduced, however, in the form of a hospital record, which might have led the jury to a contrary finding. This record shows the examination, in the San Francisco hospital, by a physician of the eye, ear, nose and throat section. Plaintiff had been referred for this examination by the genitourinary surgical section, and the examination record gave as the reason for referral that "Patient has noted a gradual loss of hearing for the past 3 years."

Plaintiff objected to this record as inadmissible hearsay, and assigns its admission as error. There is no question but that the record was properly qualified as a business record in accordance with RCW 5.45.020. The issue is whether such a hospital record can still be admissible when it shows the patient's medical history as related to his examining physician. This issue has been resolved in favor of such a record's admissibility by our decision in *Cantrill v. American Mail Line* (1953), 42 Wn. (2d) 590, 257 P. (2d) 179. See, also, *Gallagher v. Portland Traction Co.* (1947), 181 Ore. 385, 182 P. (2d) 354.

Finding no error in the instructions or in the challenged ruling on the admission of evidence, and there being substantial evidence to sustain the special interrogatories and the verdict, the judgment for the defendant is affirmed.

WEAVER, C. J., MALLERY, DONWORTH, FINLEY, ROSELLINI, OTT, and HUNTER, JJ., concur.

FOSTER, J. (concurring in the result)—While I cannot

escape the conclusion that the last sentence in the instruction defining "unseaworthiness":

" . . . A vessel that is reasonably fit for the voyage or the work for which it is intended is 'seaworthy'."

is contrary to *McAllister v. Magnolia Petroleum Co.,* 357 U. S. 221, 2 L. Ed. (2d) 1272, 78 S. Ct. 1201, and was inconsistent with the preceding portion of the instruction, I concur in the result.

April 16, 1960. Petition for rehearing denied.

