### UNITED STATES v. LESHER. *
#### No. 6795.

Circuit Court of Appeals, Ninth Circuit.
May 31, 1932.

George Neuner, U. S. Atty., and Livy Stipp, Asst. U. S. Atty., both of Portland, Or.

James F. Alexander and B. A. Green, both of Portland, Or., and Alvin Gerlack, of San Francisco, Cal., for appellee.

Before SAWTELLE, Circuit Judge, and NETERER and ST. SURE, District Judges.

NETERER, District Judge.

Reversal is sought of judgment on a verdict for plaintiff on an $8,000 war risk insurance policy claim. It is alleged that the insured became totally and permanently disabled prior to March 31, 1919, by reason of encephalitis lethargua residua. The sole is-

*Rehearing denied August 15, 1932.

54

sue is alleged error in overruling defendant's motion for a directed verdict.

Under the Seventh Amendment to the Constitution, a jury trial is guaranteed in a civil action; and that it is error to direct a verdict for defendant if there is any substantial evidence is stare decisis.

The testimony shows that plaintiff was employed from September, 1920, to December, 1922, every month, and was paid from $62.50, September, 1920, to $188.97, November, 1920, and at no time less than $99.64, which was paid in September, 1922, or a total of $4,080.33 covering the period, and he was intermittently employed thereafter until October, 1925, sometimes for four full months. There is, however, evidence that plaintiff was assisted in his duties by his fellow-workers and that but for such assistance he could not have performed.

The commanding officer of plaintiff's company testified that in April and May of 1918, while going overseas, plaintiff was acting as company clerk, and had a complete breakdown; was very nervous; did not carry on after that in a normal way; in December, 1918, was very nervous; did not concentrate on his work, and hesitated in his expressions. A sergeant in the Hospital Corps with plaintiff at Contres, France, from April, 1918, to December, 1918, knew of his breakdown in May, 1918, and saw him practically every day until December, plaintiff complaining of not being able to sleep; nervous; "shot to pieces"; went to see a doctor almost daily; in October, 1918, had an alarming temperature and was sent to a temporary hospital. The cook of the same company saw him have a fainting spell at Brest, France, "just naturally keeled over." Another member of the company returned with plaintiff on the same boat and they were together at Camp Merritt and Camp Lewis. He testified that plaintiff's appetite was very poor; sometimes he refused meals and would go without anything to eat; his mind was not normal; sometimes he would not answer a civil question; he was slow in thinking and speech; something was radically wrong before his discharge; he was nervous and had crying spells; after his discharge, in going to the auditorium from the train in Portland he had a spell and could not keep formation and had to be helped along at different times. A doctor who examined him in December, 1922, diagnosed his ailment as lethargy encephalitis—"sleeping sickness." To a proper question he said: "I would think he probably had the epidemic, encephalitis, quite prevalent at that time."

Another doctor testified: "Premised on that opinion I will state that subsequent to that date I do not believe he was able to continuously follow any substantial gainful occupation. Assuming the facts to be true as propounded in the hypothetical question, I will state that it certainly was founded upon conditions reasonably certain to prevail throughout his life."

There is testimony that in November, 1919, plaintiff, "coming in" evenings, would lie down and did not want to go out, and would burst out crying many times. His captain saw him at this time and said he was much thinner, more hesitating in his speech, and could not concentrate on any subject and had a "stary" look in his eyes.

There is testimony of fellow workmen that he was nervous; acted queer and had spells; sometimes would go home at noon and his assistants would do the work; sometimes two or three days a week this happened; and sometimes he would not report for work at all. An assistant executive told one of them, a witness, that plaintiff was an ex-service man and the boys were to help him if he could not do his work. Another witness said: "His work was kept up by the boys in the office."

At home, his family had to take care of him, almost as a child at times, help him put his coat on, cut his meat at meals, etc.

There is a connected chain of sequence with relation to conduct and actions and ability to carry on covering the entire time from September, 1920, to December, 1923, during the period he was carried on the pay rolls and received the compensation above stated. The assistant agent for the S. P. & S. Co., speaking of plaintiff's employment, said: "That does not signify he worked 53 days. If he came on in the morning and went to pieces we generally allowed him for a half day and the other boys took care of his work. We did this for Mr. Lesher. There was work available for him during the period of time of these four years; he worked 287 days."

Much other testimony of the same type and character is in the record.

This case, like all like cases, has its difficulties. There is, however, a continuity of conditions related by the witness prior to his discharge by persons who were in close contact with him, including his captain and "buddies," who, by reason of position or employment, were peculiarly situated to observe him. And this condition continued long past his earning period. He was carried on the pay roll, but "that does not signify he

worked. * * * The other boys took care of his work." The testimony, of the specialist, predicated on disclosed conditions, including medical testimony of the earliest examination, tends to an illucidation of the disability; and that was for the jury's consideration.

The court does not weigh the evidence, but considers whether there is any or sufficient evidence to sustain a verdict. See Ford v. United States (C. C. A.) 44 F.(2d) 754. And in war risk cases the most favorable construction should be given the evidence that is produced. Ford v. United States, supra. The trial judge must, in the exercise of sound discretion, determine whether upon the evidence produced a verdict can be sustained, not weigh the evidence. If there is evidence, it must be submitted; if not, it is pronouncedly his duty to direct a verdict. A mere guess or statement of a witness, even though a so-called medical expert, predicated upon no evidence or statement before the court to show continuity of condition covering the period of total permanent disability, is of no value. The trial judge can say whether there is substantial evidence to support the hypothetical question, and, therefore, the conclusion of the expert. In the instant case there is ample evidence, if believed by the jury. That was its function, and its verdict must be sustained.

Affirmed.