## UNITED STATES v. SUOMY.

### No. 7172.

Circuit Court of Appeals, Ninth Circuit.

April 13, 1934.

Carl C. Donaugh, U. S. Atty., and Edwin D. Hicks, Asst. U. S. Atty., both of Portland, Or.

Allan A. Bynon, of Portland, Or., for appellee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

GARRECHT, Circuit Judge:

Action upon a policy of war risk insurance instituted by John Helmer Suomy against the United States. Verdict and judgment were in favor of plaintiff and the government appeals. This appeal is based upon denial by the trial court of the defendant's motion for a directed verdict and the question before us is whether or not there was substantial evidence of the total and permanent disability of plaintiff on April 19, 1919, to entitle the case to go to the jury.

John Helmer Suomy, a native of Finland, possessing but a limited education, entered the war forces of the United States and saw service in the Argonne Forest in France. It

was there that during an engagement, at about the hour of 8 a. m., on October 9, 1918, a piece of shrapnel entered his left arm. Severely wounded, he made his way to a first-aid station, where his arm was bandaged. At 10 o'clock in the evening of the same day his arm was amputated, gas gangrene having set in. He was hospitalized at different places, finally finding his way to Letterman General Hospital in San Francisco. After spending three months at this hospital, he was discharged on April 19, 1919. At the time of discharge the wound was still open, with pieces of bone coming out, which condition continued for a year. Plaintiff did not work until he was given vocational training by the government in June of 1919, because, he testified, he was not feeling well and his arm bothered him. In training he studied English, business law, writing, bookkeeping, and architectural drafting. Later he tried manual training. Still later he was placed with a building company as a student under vocational training. His training period ended in July of 1923. The evidence discloses that though some of the subjects were beyond him, he was punctual and regular and that his work was neat and clean. His training was interrupted for a period of two weeks at one time, when he was hospitalized for St. Vitus dance. It was at this time that he had his tonsils removed. A neuroma developed in the stump of his left arm and an operation was performed to relieve the pain following termination of vocational training. Suomy testified that he believed the operation brought some relief during the first year following it, but that the neuroma again developed and is now much worse. It will serve no purpose to here discuss the type of pain suffered, or the conditions brought about by it, other than to state that, according to his testimony the pain is as severe as it is constant. After the close of his vocational training period, he was in placement training with a building company for about a year. He secured work following this, but three months later he was discharged because his lack of an arm severely handicapped him, and because of difficulty with the English language. Following this he took up a homestead in the mountains, had a cabin built, and stayed there for a time. Later he formed a partnership with his uncle and a friend in the contracting business and in a period of about three months they constructed a few buildings. For some time he did not do anything, but in 1925–1926 he took a trip to Finland to see his mother. A few months after his return, he formed another partnership, this time with two uncles, and again in the contracting business. A few jobs were undertaken by the partners and a small profit resulted. The partnership was dissolved and Suomy carried on business individually, with his uncles working for him. This venture resulted in about $1,000 loss. His weight was 185 pounds before entering service and 240 pounds at the time of trial. He has been twice married—once in 1919, resulting in a separation two years later, and again in 1929. He has done odd jobs, such as painting, but he testified that he was unable to work upon a scaffold or a ladder. The record does not show what Mr. Suomy did during the period from 1929 to 1931, when the complaint was filed.

He testified further that the pain was so severe as to prevent sleep; that it increases, with attempts to work, to such an extent that it distracts his mind from everything except the pain.

Witnesses testified to his extreme nervousness; that he was continually perspiring; that he was unable to sleep; that he was given to pacing about his room; and that he had to be helped to dress.

A physician, called as witness, testified (in part):

"Relative to the disturbance in the sympathetic nerve system in Mr. Suomy, we find distinct evidence of peripheral pain in this stump. This man ever since he has lost his arm has had pain from a phantom limb, constant with him day and night and as a result of that the stimuli coming into the central nervous system would have a tendency to make more irritable the rest of his nervous system; it would be a constant assault upon the ordinary equilibrium." He testified that this pain had brought on nerve disorder and that in turn increased blood pressure and fattiness. He opined that Suomy was not at that time able to follow continuously any substantially gainful occupation; that the condition was permanent; and that the plaintiff was totally and permanently disabled since the time of losing his arm.

Another physician testified that he "would say this man is not able to follow continuously any substantially gainful occupation, due to the pain he is having in this stump. * * *" He stated that the man became totally and permanently disabled at the time of his original amputation.

It was testified by the experts that a neuroma might develop quite rapidly following amputation or, on the other hand its development might be slow; that an X-ray would not

disclose its presence; that the size of the growth has no bearing on the degree of pain it might cause; that not all amputations cause neuroma, nor is there any way of telling whether one would develop; and that there is no way of telling whether an operation to remove a neuroma will be successful or not.

A third expert also gave as his opinion that Suomy was totally disabled following amputation of the arm and that the condition was a permanent one.

In defining total and permanent disability, the Supreme Court said in Lumbra v. U. S., 290 U. S. 551, 54 S. Ct. 272, 275, 78 L. Ed. 492:

"The phrase 'total permanent disability' is to be construed reasonably and having regard to the circumstances of each case. As the insurance authorized does not extend to total temporary or partial permanent disability, the tests appropriate for the determination of either need not be ascertained. The various meanings inhering in the phrase make impossible the ascertainment of any fixed rules of formulæ uniformly to govern its construction. * * * It cannot be said that injury or disease sufficient merely to prevent one from again doing some work of the kind he had been accustomed to perform constitutes the disability meant by the act, for such impairment may not lessen or affect his ability to follow other useful, and perchance more lucrative, occupations. * * * "

We think it well settled, without necessity for citation, that the burden of proof of total and permanent disability while the contract was in force is upon the insured. The mere fact of the insured's working for relatively long periods of time is not conclusive against him, nor is the mere fact of his not working conclusive of his disability.

It is said, in Asher v. U. S. (C. C. A.) 63 F.(2d) 20, 23, that:

"In passing on the motion for a directed verdict, it was the duty of the court to take that view of the evidence most favorable to the plaintiff, and to determine the matter from that evidence and such inferences as may reasonably be drawn therefrom. If, when so viewed, the evidence was of such a character that reasonable men might reach different conclusions, then the case should have been submitted to the jury. (Cases cited.) * * * "

And, in Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 233, 74 L. Ed. 720, appear the words "Issues that depend on the credibility of witnesses, and the effect or weight of evidence, are to be decided by the jury." See, also, United States v. Lesher (C. C. A.) 59 F.(2d) 53, 55.

Here, we cannot say that the work record of plaintiff was so substantial as to contradict the evidence offered in behalf of the insured. However, that was for the jury to weigh. See United States v. Dudley (C. C. A.) 64 F. (2d) 743; United States v. Baxter (C. C. A.) 62 F.(2d) 182.

The testimony was ample, if believed by the jury, to sustain the judgment. United States v. Lesher, supra.

In this case, as in United States v. Anderson (C. C. A.) 70 F.(2d) 537, decided April 12, 1934, and United States v. Todd, etc. (C. C. A.) 70 F.(2d) 540, decided April 13, 1934, the judgment is attacked (in the appellate court for the first time) upon the ground that there is no proof of loss. The complaint does not state the date of issuance of the policy of war risk insurance, and, according to the appellant's theory, the policy might have been issued after the injury to the soldier. In other words, the soldier may have been totally and permanently disabled prior to issuance of the policy. Appellate courts look with disfavor upon points urged and questions raised for the first time upon appeal. However, in the two cases above referred to, the instructions of the court to the jury were made part of the record upon appeal and in each case the asserted defect in the pleading was cured by the language of the trial court in submitting the respective cases to the jury. In this case the instructions of the court to the jury were not made part of the record upon appeal. It may be that the instructions would have cured the alleged defect in this case as well. Had the matter been presented to the trial court, it would have been a simple matter for the plaintiff to have amended his pleadings. Here, both the court and the parties proceeded through the trial as though the necessary allegations had been made and judgment was entered. We feel constrained to consider the complaint as amended. Norton v. Larney, 266 U. S. 511, 516, 45 S. Ct. 145, 69 L. Ed. 413; Realty Holding Co. v. Donaldson, 268 U. S. 398, 400, 45 S. Ct. 521, 69 L. Ed. 1014.

Another reason appears for upholding the judgment. Under the original War Risk Insurance Act Oct. 6, 1917, §§ 400 and 401 (40 Stat. 409), the soldier was compelled to make application for policy within 120 days after entrance into the service and before

discharge. Roughly, the 120-day period would have expired for Mr. Suomy on or about February 2, 1918, he having entered the Army October 2, 1917, and he was not wounded until over a year after his entry into the service. Almost 240 days elapsed from the last day on which he could have applied for such insurance and the date of the injury which was the root of his disability.

Affirmed.