## UNITED STATES v. BEMIS.
### No. 9012.

Circuit Court of Appeals, Ninth Circuit.
Dec. 5, 1939.

Julius C. Martin, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett, Sp. Asst. to Atty. Gen., Thomas E. Walsh, Atty., Dept. of Justice, of Washington, D. C., and Carl C. Donaugh, U. S. Atty., J. Mason Dillard, Asst. U. S. Atty., and Gerald J. Meindl, Atty., Dept. of Justice, all of Portland, Or., for appellant.

Rex Kimmell, of Salem, Or., for appellee.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

GARRECHT, Circuit Judge.

There is but one question presented by this appeal: Whether there was any substantial evidence to show that plaintiff became totally and permanently disabled before the expiration of his war risk insurance policy on July 31, 1919? Complaint was filed December 27, 1935, issue was joined by the answer, and the cause was tried before a court sitting with a jury, which returned a verdict in favor of the plaintiff. Judgment was entered thereon.

The plaintiff enlisted in the military forces of the United States at Burley, Idaho, June 28, 1918; he was then twenty-four years of age and a farmer. On or about the first of August of the same year he arrived at Camp Mills, Long Island. August 5, 1918, he accidentally shot himself in the left ankle while cleaning his rifle. He was placed in the Camp hospital for treatment, and the X-ray revealed that the bones of the left ankle had been fractured. He remained in the Camp Mills base hospital until October 16, 1918, spending the entire time in bed. While he was in this hospital, at least two operations were performed on his ankle. On the date last mentioned he was transferred to General Hospital No. 3 at Colonia, New Jersey, where he remained until June 18, 1919. While at Colonia he was operated upon at least twice, and perhaps three times. He was confined to bed from the day of his arrival until the end of May, 1919, at which time he was permitted to sit up in a wheel chair. Bemis testified that while he was in bed in the hospital, his leg was kept elevated and the wound irrigated with antiseptic or healing solution; that his back hurt and pained him at the time he began to be up in the wheel chair and on crutches. In June he began walking on crutches and was then transferred to Camp Lewis, Washington, at which station he arrived June 23, 1919, and was immediately placed in the hospital there. On the next day he applied for a furlough to visit his home, which was denied him, and he thereupon boarded a train and went home without leave.

From Camp Lewis he went to Portland, Oregon, and thence to Burley, Idaho. He explained this move by stating that his sister had been ill in Portland and that he went there expecting to see her, but that she had been taken to Burley and he had followed her there.

While in Burley and Rupert, Idaho, a few miles from Burley, because of the failure of his injured foot and ankle to heal properly and also, as he stated, because of his back condition, he consulted and received treatment from a Dr. Cooper during the summer and fall of 1919. In addition, he submitted himself to the care of a Dr. Groom in Rupert, receiving electric treatments for his back.

On November 10, 1919, Bemis wrote to his commanding officer from Burley, requesting a transfer to Fort Douglas, Utah.

Under date of December 31, 1919, he was advised by the Camp Adjutant of Camp Kearny, California, to surrender himself at Fort Douglas, Utah, but Bemis had already surrendered himself there on December 6 or 7, 1919. He was discharged from the United States Army April 13, 1920, "by reason of physical unfitness for service." January 5, 1920, the surgeon at Fort Douglas, Utah, wrote a report on Jess Bemis to the commanding officer of the fort, as follows:

"1. Investigation of the advisability of discharging Pvt. Bemis on C.D.D., reveals the fact that he is under arrest here, and that he has been reported by a medical officer as in good physical condition.

"2. Bemis is not in good condition. He is not able to perform the duties of a soldier, or prisoner, and never will be able. He had a discharging sinus where he claims to have accidentally shot himself thru the left ankle while cleaning his rifle at Camp Mills, N. Y., August 6th, 1919 [sic.?]."

Subsequent to enlistment, and prior to the date of the accident, the plaintiff applied for and was granted a policy of war risk insurance in the sum of $10,000. It was stipulated by counsel "that the plaintiff's policy of war risk insurance lapsed on July 31, 1919."

Immediately following his discharge he returned home to Burley, Idaho. He was on crutches at this time and shortly thereafter submitted to an operation on the ankle, which was performed by Dr. Cooper, the Government doctor at that place. The wound thereafter went through alternate periods of healing and breaking open, on the latter occasions discharging pus and, at times, small pieces of bone. By June 22, 1922, Bemis had had nine operations on his foot. Ankylosis set in and the joint stiffened; osteomyelitis attacked the bone, and finally, on September 24, 1934, it was necessary to amputate the plaintiff's left leg just below the knee. Later, in 1935, another piece of the small bone of the left leg was removed. The operations were performed by Dr. George E. Pfeiffer, Chief Surgeon, United States Veterans' Hospital, Portland, Oregon.

Aside from a period of approximately fifteen months during which the plaintiff pursued vocational training in a battery shop at Idaho Falls, Idaho—from spring, 1921, to June, 1922—the veteran is practically without any "work record." He

secured many jobs but held none of them for any length of time, and on some the work was done by his wife. He had but a third grade education, and his field of endeavor was limited by his lack of education. He testified that work tired him, left him weak, and caused him intense pain and discomfort, and in this he is substantiated by his wife and other witnesses.

■ In some cases the work record and vocational training period and the success achieved therein may conclusively negative any concept of total permanent disability; in other cases, however, such evidence lacks conclusiveness and is not in and of itself decisive of the issue. In the latter instances such facts are to be weighed and considered by the jury together with all the other evidence in the case. We cannot say that the vocational training undertaken by the plaintiff in this case conclusively negatives total permanent disability. In considering this point in United States v. Alger, 9 Cir., 68 F.2d 592, 593, we said:

"While in many cases evidence of an insured having taken vocational training may be an indication or even proof that he is not totally and permanently disabled, it is not conclusive in all cases. It must be remembered that vocational training was in the nature of schooling and necessarily not so exacting nor so intense as actual employment in such work. The same may be said of placement training where salary was paid by the government and the student or helper was not watched so closely nor was so much expected of him as would be the case if the individual was being paid on the basis of work accomplished. Vocational training was but an effort upon the part of the government to make one, who had been deprived of his means of livelihood, self-supporting, and assurance that it is or will be successful does not follow from its commencement. We are agreed that in many and most instances vocational training and placement training are inconsistent with total and permanent disability, but the rule is not inflexible, and here we conceive the case to be without the rule."

■ The benefits accruing out of a contract of war risk insurance extend only to death and total permanent disability occurring while it is in force. "The policy does not cover total temporary disability or partial permanent disability, and does not authorize or permit any payment for physical or mental impairment that is less than 'total permanent disability.'" United States v. Spaulding, 293 U.S. 498, 504, 55 S.Ct. 273, 276, 79 L.Ed. 617. See Act of October 6, 1917, 40 Stat. 409, as amended. In order to recover under such contract, the burden is on the plaintiff "not only to show the character and extent of his injury, but also to show that the result of the injury was to disable him permanently from following any substantially gainful occupation. [Cases cited.]" Miller v. United States, 294 U.S. 435, 440, 55 S.Ct. 440, 442, 79 L.Ed. 977.

The appellant, in support of its appeal, offers citations of War Risk Insurance cases concerning policy-holders who were denied recovery because in those cases, the loss of a leg by the insured was held not totally and permanently disabling. We had occasion, not long since, to consider a situation somewhat similar to the instant case in United States v. Thompson, 9 Cir., 92 F. 2d 135, 139. We there said:

"Of these war risk insurance cases, perhaps more than of any other class, it may be said that each case must be governed by its own facts. Hardly any case comes squarely within the facts and law as determined by another. So, the cases cited by appellant to the effect that loss of the use of one leg is not enough, in ordinary circumstances, to amount to a total disability, although it is, unquestionably, a partial permanent disability, are all distinguishable upon the facts from the one at bar. It must be kept in mind that the appellee does not contend that the loss of his leg alone made his disability totally permanent, but that this injury, coupled with the other facts and surrounding circumstances here presented, did produce a condition of total disability which was permanent."

There was sufficient evidence to justify a jury in finding that the injury to Bemis's ankle was permanent, or reasonably believed to be so at the time of or prior to the expiration of his policy of war risk insurance, and events since that time have so proved. It could fairly be found, almost without fear of contradiction, that the ankle injury and subsequent amputation resulted in partial permanent disability. But it has been held in Thompson v. United States, 8 Cir., 65 F.2d 897, 898, "* * * that the loss of a leg between the knee and ankle, *in the absence of other complications,* cannot be regarded as a total and permanent disability. It is a partial permanent disability." [Emphasis supplied]

We inquire into the presence, then, of other complications. We find the appellant testifying that he suffered pain in his back from June, 1919, and that this pain continued with unabated severity down to the date of trial. Plaintiff's wife, sister, mother-in-law, brother-in-law, an employer, and three friends gave testimony which tended to corroborate that given by the plaintiff. The testimony of the plaintiff and that of his sister went back to a time when the policy was in force. Dr. C. P. Groom, a witness for the plaintiff, testified that he examined Bemis in Rupert, Idaho, in August or September of 1920; that Bemis complained of "backache and general pain through the region of his back and hip"; that he treated Bemis to relieve backache; and that he diagnosed Bemis's condition as arthritis of the spine.

In rebuttal the defendant introduced evidence, both oral and documentary. Government records, made on various examinations of Bemis by Government physicians and surgeons at dates from October 2, 1920, to July 31, 1931, do not disclose any complaint of backache, or weakness of back, at least so far as we are able to ascertain from record, save that on December 12, 1928, he complained of pain in his tailbone as a result of an accident. The next recorded instance of Bemis's complaint regarding his back to Veterans' Bureau medical officers occurred on November 22, 1932; all reports of medical examinations of Bemis made thereafter also contain complaints of back pains, and government records and witnesses admit he suffered from an arthritic condition of the lower spine at the time of trial and for some time prior thereto. The defendant also introduced evidence that Bemis, while employed for a short period in the spring of 1924, was struck by a falling pole and received an injury to his back.

But this evidence served only to create a conflict finally to be resolved by the jury, if the evidence offered by the plaintiff was sufficiently substantial to warrant submission to said jury. This question was brought before the court at the close of all the evidence by a motion of the defendant for an instructed verdict in its favor. The motion was denied. In this appeal we assume as established all the facts that the evidence supporting plaintiff's "claims reasonably tends to prove, and that there should be drawn in his favor all the inferences fairly deducible from such facts.

Gunning v. Cooley, 281 U.S. 90, 94, 50 S. Ct. 231, 74 L.Ed. 720." Lumbra v. United States, 290 U.S. 551, 553, 54 S.Ct. 272, 273, 78 L.Ed. 492.

It is not necessary, in order to justify submission of a case to the jury, that the evidence bring conviction to the mind of the trial judge, or that, to sustain his denial of a motion for a directed verdict it should convince us. It is sufficient for submission if the evidence be of such a character that reasonable men might reach different conclusions thereon. Asher v. United States, 8 cir., 63 F.2d 20, 23; United States v. Suomy, 9 cir., 70 F.2d 542, 546; Sorvik v. United States, 9 cir., 52 F. 2d 406, 409; United States v. Alger, 9 cir., 68 F.2d 592, 593. Of course, a mere scintilla is not enough. But there is here some substantial evidence to support the fact ·in issue.

Affirmed.