Rose WONG and Kent Wong, Appellants,

v.

Walter SWIER and Laura Swier, Appellees.

No. 16116.

United States Court of Appeals Ninth Circuit.

April 10, 1959.

---

Thomas K. Hudson, Alice Loveland, Denver, Colo., for appellants.

Homer B. Splawn, Yakima, Wash., for appellees.

Before POPE and JERTBERG, Circuit Judges, and YANKWICH, District Judge.

### YANKWICH, District Judge.

In this action for personal injuries to the appellant Rose Wong, a resident of Idaho,—to be referred to hereinafter as "the appellant" (Kent Wong being joined merely because he was her husband), —alleged to have been caused by the negligence of the appellees Walter and Laura Swier, residents of Cowiche, Washington, through failure to furnish a safe ladder while she was engaged in picking apples in an orchard owned by the appellees, the jury's verdict was against the appellant. A motion for a directed verdict [1] in favor of the appellant made at the conclusion of the testimony was denied, as was also a motion, made after the entry of the judgment for the appellees, for a judgment notwithstanding the verdict, or, in the alternative, to grant a new trial.[2]

Before us is an appeal from the judgment entered upon the verdict.[3]

This being a diversity case,[4] the rights of the parties are governed by state law,—the District Court trying the case sat, in effect, as a State Court.[5] This fact is of utmost importance, in this case because, in passing on the alleged errors committed by the trial court, we must apply the law of negligence and the law of master and servant of the State of Washington.

### I

#### The Law of Washington

Under Washington law, it is the duty of the employer to furnish to his employee a reasonably safe place in which to work [6] and to provide him with proper and reasonably safe appliances and use ordinary care in so keeping them.[7] However, the law of Washington recognizes that it is the duty of the employee to exercise reasonable care to avoid injury to himself. And in applying the doctrine, the Washington courts hold that the employee assumes the ordinary risks of employment or such extraordinary risks as are apparent to the ordinarily prudent employee.[8]

As stated in a late case:

"While it is the legal duty of an employer to furnish his employees a reasonably safe place to work, it is also the rule that one who, as servant or employee, enters into the service of another, assumes by his contract of employment the risk of all dangers ordinarily incident to the work upon which he engages (Walsh

1. Rule 50(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

2. Rule 50(b) and Rule 59 of Federal Rules of Civil Procedure.

3. 28 U.S.C. § 1291.

4. 28 U.S.C. § 1332(a) (1).

5. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188; Guaranty Trust Co. of N. Y. v. York, 1945, 326 U.S. 99, 108, 65 S.Ct. 1464, 89 L.Ed. 2079; Angel v. Bullington, 1947, 330 U.S. 183, 186–187, 67 S.Ct. 657, 91 L.Ed. 832; Woods v. Interstate Realty Co., 1949, 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524.

6. Goddard v. Interstate Telephone Co., Ltd., 1910, 56 Wash. 536, 106 P. 188.

7. McGinn v. North Coast Stevedoring Co., 1928, 149 Wash. 1, 270 P. 113, 116; Etel v. Grubb, 1930, 157 Wash. 311, 288 P. 931; Focht v. Johnson, 1957, 51 Wash. 2d 47, 315 P.2d 633, 634; Pacific Telephone & Telegraph Co. v. Starr, 9 Cir., 1913, 206 F. 157, 161–162, 46 L.R.A.,N.S., 1123.

8. Rawlins v. Nelson, 1951, 38 Wash.2d 570, 231 P.2d 281; Myers v. Little Church by the Side of the Road, 1951, 37 Wash.2d 897, 227 P.2d 165; Hurst v. Washington Canners Co-op, 1957, 50 Wash.2d 729, 314 P.2d 651, 653.

v. West Coast Coal Mines, 31 Wash. 2d 396, 197 P.2d 233) and also the extraordinary risks of employment if they are open and apparent, although due directly to the master's negligence.[9]

■ In the application of these doctrines, the Washington courts hold that whether the duty was or was not performed, whether the risk was or was not assumed, whether there was negligence or contributory negligence are questions of fact.[10] And even where the facts are undisputed, unless they are of a character that reasonable persons can *draw one inference only* from them, a question of fact is present.[11]

## II

### The Facts in the Case

■ In considering the facts in the light of the principles just outlined, we are mindful of the fact which has been stressed by this Court over a long period of years that on an appeal of this character we do not weigh the evidence but determine only whether there is "any or sufficient evidence to sustain (the) verdict."[12]

9. Focht v. Johnson, supra note 7, 315 P. 2d at page 634.

10. Myers v. Little Church by the Side of the Road, supra note 8, 227 P.2d at pages 169–170; Hurst v. Washington Canners Co-op, supra note 8, 314 P.2d at pages 653–654. This has been the accepted doctrine in Washington through the years. See, Hoffman v. American Foundry Co., 1897, 18 Wash. 287, 51 P. 385, 386–387; Le Claire v. Washington Water Power Co., 1915, 83 Wash. 560, 145 P. 584, 585–586.

11. Hurst v. Washington Canners Co-op, supra note 8, 314 P.2d at pages 653–654; Brandt v. Northern Pac. R. Co., 1919, 105 Wash. 138, 177 P. 806, 807, 181 P. 682; Kilmer v. Bean, 1956, 48 Wash.2d 848, 296 P.2d 992, 995.

12. United States v. Lesher, 9 Cir., 1932, 59 F.2d 53, 55. See, United States v. Alger, 9 Cir., 1934, 68 F.2d 592, 595; United States v. Thompson, 9 Cir., 1937, 92 F.2d 135, 139–140; United States v. Bemis, 9 Cir., 1939, 107 F.2d 894, 897;

The reason behind the rule has been stated· by the Supreme Court:

"Issues that depend on the credibility of witnesses, *and the effect or weight of evidence, are to be decided by the jury*. And in determining a motion of either party for a peremptory instruction, the court assumes that the evidence for the opposing party proves all that it reasonably may be found sufficient to establish, and that, from such facts there should be drawn in favor of the latter all the inferences that fairly are deducible from them. Texas & Pacific Ry. Co. v. Cox, 145 U.S. 593, 606, 12 S.Ct. 905, 36 L.Ed. 829; Gardner v. Michigan Central Railroad, 150 U.S. 349, 360, 14 S.Ct. 140, 37 L.Ed. 1107; Baltimore & Ohio R. R. Co. v. Groeger, 266 U.S. 521, 524, 527, 45 S.Ct. 169, 69 L.Ed. 419. Where uncertainty as to the existence of negligence arises from a conflict in the testimony *or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury*."[13] (Emphasis added.)

Standard Accident Ins. Co. of Detroit, Mich. v. Winget, 9 Cir., 1952, 197 F.2d 97, 101.

13. Gunning v. Cooley, 1930, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720. See, Eckenrode v. Pennsylvania R. Co., 1948, 335 U.S. 329, 330, 69 S.Ct. 91, 93 L.Ed. 41; Standard Accident Ins. Co. of Detroit, Mich. v. Winget, supra Note 12; Moist Cold Refrigerator Co. v. Lou Johnson Co., 9 Cir., 1957, 249 F.2d 246, 251–252; Allen v. Matson Navigation Co., 9 Cir., 1958, 255 F.2d 273, 281. This is also the law of Washington. In Kellerher v. Porter, 1948, 29 Wash.2d 650, 658, 189 P.2d 223, 226, the Court said:

"A challenge to the sufficiency of the evidence, a motion for nonsuit, a motion for a directed verdict, or a motion for judgment notwithstanding the verdict admits the truth of the evidence of the party against whom the challenge or motion is made and all inferences that reasonably can be drawn from such evidence, and *requires that the evidence be interpreted most strongly against the chal-*

So considered, we are of the view that there is substantial evidence in the record to sustain the verdict of the jury, and that the trial court was right in denying the motion for a directed verdict made at the conclusion of the presentation of evidence and the motion for a judgment notwithstanding the verdict made after the judgment on the verdict had been entered upon the ground that the only reasonable interpretation of the evidence was that the ladder was defective.

The complaint alleged negligence in failure to supply the appellant with a safe ladder on October 17th when she was employed as an apple picker in the appellee's orchard. The complaint also averred that the ladder furnished was unsafe, defective and dangerous, facts of which she alleged she was ignorant, and that while so engaged she fell, sustained severe injuries which she attributed to the dangerous and defective condition of the ladder. General and specific damages in the total sum of $100,000 were sought.

The Answer of the appellees admitted employment and the occurrence of the injuries but denied liability, and pleaded that whatever conditions existed

"in respect of the ladder and the use thereof were assumed by the plaintiff and the risk thereof, if there were any risk attached thereto."

In a pretrial order the following facts were admitted:

"1. That all defendants are residents of the State of Washington;

that plaintiffs are residents and citizens of the State of Idaho; and that this Court has jurisdiction herein.

"2. That the plaintiff Rose Wong was on October 17, 1955, in the employ of the defendants Walter Swier and Laura Swier, and that as such employee she used a ladder furnished by these defendants, and that said defendants Walter Swier and Laura Swier were under a duty to furnish said plaintiff a safe ladder.

"3. That the plaintiff Rose Wong sustained injuries by reason of a fall from said ladder in the course of her employment."

As the judgment was against the appellant there is no need to go into a description of the injuries she suffered and the treatment and hospitalization she was forced to undergo. The more so, as the doctor and hospital brought in as defendants were eliminated from the case and the case proceeded only against the Swiers. There is no question that the injuries suffered were serious. What we are concerned with here is to determine whether, as contended by the appellant, a verdict should have been directed for the appellant. Such a verdict can be directed only if the evidence is such that the Court can say that legally, the evidence is capable of only one interpretation, and that is in favor of liability.[14]

It was the appellant's contention—as set forth in the Pretrial Order—that the ladder was defective in that the hinge or yoke assembly at the top of the ladder was loose, permitting excessive play in

---

*lenger or movant party and in the light most favorable to the opposing party."* (Emphasis added.)

14. Rule 50(b), Federal Rules of Civil Procedure; 88 C.J.S. Trial § 210. In Berry v. United States, 1941, 312 U.S. 450, 452–453, 61 S.Ct. 637, 638, 85 L. Ed. 945, the Supreme Court said:

"Rule 50(b) goes further than the old practice in that district judges, under certain circumstances, are now expressly declared to have the right (but not the mandatory duty) to enter a judgment

contrary to the jury's verdict without granting a new trial. But that rule has not taken away from juries and *given to judges any part of the exclusive power of juries to weigh evidence and determine contested issues of fact—a jury being the constitutional tribunal provided for trying facts in courts of law.* Here, although there was evidence from which a jury could have reached a contrary conclusion, there was testimony from which a jury could have found these to be the facts; * * *." (Emphasis added.)

the ladder; that the hole in the metal plate and the side of the ladder were larger than the bolt used to hold them, thereby permitting the additional play in the ladder and twisting of the ladder in its use, and that it was this condition of the ladder which caused appellant's fall and injury.

There is a brief statement in her testimony which sums up the alleged manner in which the accident happened:

"The accident occurred on that morning after we had been in the orchard over an hour. I had climbed the ladder after I had set it carefully, testing it on both sides to see that it was well-balanced, and had ascended to the second rung from the top and picked the apples within reach and had turned, the apples were to the left. I turned my body slightly to the right in order that the bag which was then about full of apples would not hit on the ladder, and as I turned my body there was a quick give of the ladder. It went out from under my feet. I made a grab for a limb but could not hang on, and I fell."

Other facts testified to by her were: At the time, she was preparing to go down the ladder. She had no experience in picking apples prior to 1955. When the accident occurred she had picked apples in the orchard, using the same ladder, for several days. In September, for about a week, she had picked pears on the Swier place and had learned to fix and set a ladder. The apple orchard was practically level and was irrigated by an irrigation system that was corrugated. She never complained to Swier or anyone else about anything concerning the ladder.

On the day of the accident she had begun to work about 8 A.M. and the accident happened about 11 A.M. She had picked on more than seven trees. She had nearly finished the picking of the tree near which the accident occurred.

The tongue of the ladder was towards the trunk of the tree and near the boxes of apples on the ground. She remembered placing the ladder solidly with the tongue centered making sure that the ladder was spaced solidly on the ground. She did not know whether anyone saw her fall or not.

When the accident occurred she was on the second rung from the top. She had been picking apples to her left. They were not immediately in front of her. The apples picked were placed in a bag. After the bag was full it was taken down and the apples put in boxes. When the accident happened she did not hear any sound at the top of the ladder. As she put it, "it gave away".

■■ The appellant's version of the accident need not be accepted as the correct one. The question of negligence is one for the jury, even when testimony is uncontradicted.[15]

The appellant and her husband, who is Chinese, after her release from the hospital, continued to reside on the Swier ranch until June, 1956. She had been a missionary in China and after the Japanese occupation returned to Washington and made her home on the Swier ranch before her husband came back from China. At various times they and their children had been guests at the ranch, she residing in a tenant house. The last time they returned was in June, 1955. After the accident they made no complaint to the Swiers about the condition of the ladder. When the accident happened the Swier's adopted son, David, was picking about three rows from appellant. Appellant's daughter started running from the house to the orchard. He heard her and went over to see what was wrong:

"Q. (By Mr. Splawn): What did you observe about the ladder when you arrived there? A. The ladder was tipped, it was over, the tongue was over a pile of apples, boxes full of apples.

15. Gunning v. Cooley, supra Note 13.

"Q. How big was this pile of apples that the tongue was over? A. About six to nine boxes.

"Q. And how high were they stacked? A. They were three high.

"Q. And the legs of the ladder, where were they with reference to this pile of boxes? A. They were on one side of the boxes, the tongue on the other.

"Q. Was the ladder on the ground? A. No, leaning against the limb.

"Q. Against a limb? A. That is right.

"Q. Now, when you arrived there did Mrs. Wong say anything concerning what had happened to her and, if so, what did she say? A. *I don't know the exact words, something about, something on the order of reaching too far and falling and striking her leg on the box.*"

The appellee, Walter Swier, testified that in December, 1955, after the appellant returned to the ranch from the hospital, he asked her what had brought about the fall. Her answer was:

"Well, she said she didn't know definitely, but as near as she could remember, she had reached out for some apples as she was about to finish the tree, and she was up about five or six steps and was coming down."

From this testimony, if believed, the jury could draw the inference that she had reached too far and that her weight and the weight of the sack of apples had caused an overbalance which tilted the ladder and caused her to fall. This conclusion would be confirmed by the description of the condition of the ladder given by David Swier, who stated in the portion of the testimony already reproduced, that the ladder was tipped, leaning against a limb, the tongue being on one side of the boxes full of apples, the legs on the other.

Ordinarily one who is injured through the negligence of another is under no obligation to complain or explain, but the long friendly relationship and association of the parties here were such that it is inconceivable that the appellant would have concealed or lacked frankness in discussing the injury and the cause of it with her employers who had also been her friends for some thirteen years. So the statements made by her and the failure to place blame acquire special significance. The jury was told in detail the long association between the parties, the manner in which they treated one another, the fact that the appellant's children lived at the Swiers' and that they themselves had been guests for long periods of time.

Eliminating the medical testimony with which we are not concerned, the appellant offered the testimony of a witness, Chauncey W. McDonald, employed as Safety Inspector for the Department of Labor for the State of Washington, who testified that he had inspected the ladder, that it was not a reasonably safe ladder, that because of the looseness of the top yoke the ladder would go into a twist and that, in his opinion, it was unsafe. He admitted, however, that some ladders of the type were used in Yakima Valley, but that it was not a common use, and that up to the fourth step from the top the ladder is reasonably safe. In giving his testimony he used the ladder as an exhibit to demonstrate his point.

As against this testimony we have not only the testimony of the Swiers that the ladder was inspected and that it had no flaw when it was turned over to the appellant, but also the testimony of several other witnesses as to its safeness.

Cecil Clark, an expert for the appellee, who had spent many years on orchard ladders and who had devoted forty years of his life to orcharding and had handled literally hundreds of ladders, owning a hundred of them, testified that the ladder was of the type used more than any other in the Yakima Valley, that the particular ladder was better than the average ladder he had examined and,

while it had a little play in it, this was not detrimental because,

"A ladder that is too rigid is more prone to tip than one that has a little give to it."

He described the tests he made of the particular ladder in this manner:

"I checked the steps to see if they were tight. They were. I wiggled the tongue to see what the condition of that was, and it was satisfactory, so I set it up and climbed it and went to the eighth step, wiggled it and shook it all the way up, and it was perfectly safe to use, and if you put it on a tree, I will go to the top, the tenth step. I have got a little too much claustrophobia, or something, in the open air to go beyond the eighth step, but it is perfectly safe to go to the top step and work on it.

"Q. Now, so far as static weight is concerned, and by that I mean just standing on any rung of the ladder up to and including the last rung before the very top, with no impacting of the ladder, no shaking, no jerking, no reaching to one side or the other, but dead-weight, is there anything about that ladder that could conceivably cause it to tip over or collapse? A. No, there is nothing about the ladder. A picker on that ladder to fall has got to do one of two things; first, is to either improperly place the ladder, set it up wrong, or else lean too far out; and with the numerous falls I have had on my place and with the ones I have made myself—I have fallen off a ladder a number of times just simply because of reaching out too far to get the last fruit and didn't want to get down and move it, just reaching out too far, that is what pretty nearly always makes a ladder tip over, unless it's improperly set up.

"Q. Above the sixth rung, Mr. Clark, that is taking the ladder above the sixth rung, that is standing on it at any rung above the sixth rung, is there any difference in that that you can see or that actually exists to make it unsafe for apple picking purposes? A. Not as far as this ladder is concerned. Of course, the higher you go on any ladder, the easier it is to overbalance it by leaning.

"Q. Is that a ladder condition or is that a picker maneuvering? A. Well, that is a picker maneuver.

"Q. Now, the higher you go on this ladder, and so far as any play is concerned in the tongue assembly at the top, what is the effect as you take weight up the ladder, so far as that condition is concerned? A. Any condition with the top of that ladder would make no difference on any step on it clear to the tenth. As I said, I would not hesitate if it was in a tree, to get on the top step and pick a prune, or any other thing. Of course, I wouldn't want to lean way out across the tree, I would have to use some judgment about handling myself on it."

From this testimony the jury could draw the inference that the appellant did not observe the proper caution, as she got up on the higher rungs of the ladder to prevent unbalancing. This, especially in view of the testimony of the same witness that a ladder that is tight at the top, that is a new ladder, is more likely to tip, while if it is loose it will absorb the movement.

In answer to a hypothetical question, embodying the testimony of the appellant, this witness testified that, in the circumstances described, the ladder would not move at all, it could not collapse and that the only thing that could cause it to tip would be leaning too far, assuming that it was properly set. His answer is given in full:

"A. The only thing that could cause it to tip, then, would be leaning too far, reaching for those two or three apples that you ought to reset the ladder to get and you just don't want to do it, and so you reach

just a little too far, and then once it starts, if you throw it off balance by shifting your weight too far, then you can't unless you have got a tray to grab, or something, you can't straighten it up, but with normal procedure of turning and moving around, you have to turn a certain amount to bring your bag of apples down, because you can't bring them straight down in front of you. It's done millions of times, and there would be no reason in the world why you couldn't turn with a full bag of apples, a full boxful, and bring them down without any movement or trouble of the ladder whatsoever.

"Q. And that is including the play with this tongue it has in the assembly at the top, is that right? A. Yes, sir, that last just the way it stands there now."

It would serve no useful purpose to give summaries of the testimony of other witnesses such as C. A. Brazil, Ben Hovde, Louis C. Moritz and Herbert Rossow, called by the appellee, who, like the preceding witness, testified that the ladder was one in common use and that the condition in which it was when observed would not have caused the accident but that the accident must have been caused by overreaching to a point where the weight of the body is off the center of the ladder, if it were properly set.

When to this we add the testimony of the appellee, Swier, and that of his son as to the condition of the ladder, the failure of the appellant to complain, the admissions made by her that the ladder tipped because she reached out too far, we have ample facts from which the jury could infer that there was no negligence on the part of the appellees to which the accident could be traced. As no special verdict or interrogatories [16] were submitted, it is not necessary for us to try to determine upon what theory the jury decided the case. A verdict for the appellees is a verdict on all issues presented by them.[17] Appellees had several defenses,—no negligence on their part, contributory negligence and assumption of risk,—any of which, if found in their favor by the jury, would justify a verdict.

We have treated the subject fully, because practically behind all the assertions of error, lies the assumption that the ladder was defective and that this fact was established by uncontradicted testimony.

■ In what precedes we have already indicated, without giving a synopsis of the testimony of every witness, that there was a sharp conflict of evidence as to the condition of the ladder, a conflict which could be resolved only by a verdict of the jury and could not have been resolved either by a judgment for a directed verdict, at the conclusion of the testimony or by a judgment notwithstanding the verdict after the verdict was returned. There is no substance to the argument that, because no proof was offered in opposition to the items of special damage incurred, such as hospital bills and the like, we have, at least, a partial admission in that repect. The failure to deny that special damages were incurred in hospitalization admits, at most, that the expenses were incurred. But it does not constitute an admission of liability. Before liability for them or for the general damages for pain and suffering and partial or permanent disability accrues, it was necessary that the jury find that the injuries were caused by the negligence of the appellee. Even in cases in which liability is admitted, the jury must still determine the amount of general damages to be awarded. Here the special damages incurred were but a small fraction of the $100,000.00 in damages

16. Rule 49, Federal Rules of Civil Procedure.

17. 89 C.J.S. Trial § 521c; Dickins v. International Brotherhood, 1948, 84 U.S. App.D.C. 51, 171 F.2d 21, 25; Rowe v. Safeway Stores, Inc., 1942, 14 Wash.2d 363, 128 P.2d 293, 298.

sought by the appellant. Without a finding of liability in favor of the appellant, the question of damages could not even be raised.

In instructing injuries, trial judges warn them that the question of damages *is not* to be considered unless the jury *first* finds liability on the part of the defendant. The Court in this case so warned them by saying:

"Now, before I give you this instruction on the measure of damages, I wish to comment briefly that this instruction is not intended to indicate in any way what I think should be your verdict. I have no means of telling in advance whether you will find that the plaintiff is entitled to recover or find for the defendant. *In case you do find for the plaintiff, then, of course, you will have use for these instructions as to measure of damages."*

As the verdict was in favor of the appellee, no item of damages stands admitted, as to which a verdict in favor of the appellant could have been directed at the conclusion of the evidence or a judgment notwithstanding the verdict entered after the verdict of the jury came in. Which brings us to a consideration of the alleged tampering with the ladder during the course of the trial.

### III

### The Alleged Tampering With the Ladder

After the appellant's fall from the ladder it was taken by the appellee to the Dependable Ladder Company, in Yakima, Washington, for safe keeping. It was kept there in dry storage. It was inspected at the place of business of the ladder Company on March 15, 1957. The persons present were Thomas K. Hudson, Miss Alice Loveland, attorneys for the appellants, Mr. George Mullins, of counsel for the appellant, and Mr. Robert I. Bounds, an associate of counsel for the appellee. On a Friday morning, prior to the commencement of the trial on March 24, 1958, the ladder was

again inspected by the same persons and then brought to the courthouse and placed in the corridor where it remained until offered in evidence later in the course of the trial.

It is the contention of the appellant that the ladder was tampered with during that interval. Mr. Hudson and Miss Loveland testified that additional washers had been inserted in the top assembly and that the bolts had been tightened. Mr. Mullins testified that there was a change in the ladder because on the previous inspection there was lateral play of the yoke between the two side plates of the ladder and there was a difference between the metal on the hinge at the top and the metal side plates at the top of the ladder. It was his view that as of the date he testified there was no lateral play. Against this testimony there is the testimony of Herbert Rossow who had been present at the first inspection the year before. He testified that he could find no change in the condition of the ladder from what it had been during the time it was stored at the ladder Company. One of appellee's witnesses, Louis C. Moritz, who examined the ladder and tested it at the ladder company's storage quarters three weeks before the trial, and who examined it again in the courtroom, when he testified on the fourth day of trial, stated that the ladder was not different at the time when he was giving his testimony from what it had been when he examined it three weeks before. Similar testimony was given by David Swier who had prepared the ladders, including the one involved, putting washers on the bolts at the top of it, and by Walter Swier, who examined the ladder in the summer of 1955, after the fall, and moved the tongue laterally, finding that its arc was three inches one way and four inches the other from the center of the ladder. Mr. Kent Wong, the appellant's husband, was with him when this was done. At the trial, Walter Swier testified that the play of the tongue was identical and that in all other respects

there was nothing different about the ladder from what it was while on his place and before it went to the ladder Company.

Interesting testimony was given by Mr. Robert I. Bounds, an attorney associated with the appellee's attorneys, who, however, has no interest in the particular lawsuit. He accompanied Mr. Homer B. Splawn, counsel for the appellee, to the ladder Company on the morning of the trial. He had also been present on the Friday before the trial when the ladder was inspected by the group already mentioned, including counsel for the appellant. On Monday morning, March 24, 1958, the ladder was in the same place and position as it was when it was left on Friday. He and Splawn put the ladder in the back of Splawn's station wagon. They also put in three boxes of dirt, a coil of baling wire, three boxes of apples and a picking bag. They came directly to the courthouse, took the ladder out of the car, Splawn carrying it up. They put it in the corridor on the south end of the courtroom. They made several trips bringing up additional baling wire, apple boxes and dirt. The ladder was set in place and the two left at the same time.

It is quite evident from what precedes that against the evidence of tampering, there was in the record testimony tracing the condition of the ladder from the time of the accident to the courthouse and that witnesses testified that there had been no tampering.

The charge of tampering was gone into fully before the jury, appellant's attorneys taking full advantage of the situation. Some of them testified before the jury to the alleged fact of tampering. The appellant's other witnesses testified fully to the condition of the ladder. The jury's verdict must be taken as a finding against the contention that there had been alteration in the condition of the ladder, as it must also be taken as a finding that the ladder was not defective.

We have gone into these details because the alleged tampering is made the basis for two assignments of error, (1) the failure of the court to direct a verdict because of the tampering with the evidence and (2) the failure to give the instructions requested on the subject.

At the outset, it should be observed that counsel for the appellant misconceive entirely the law on the subject. All that the authorities say, even those which they cite, is that when there is tampering with evidence, *a presumption against the parties who are responsible arises.*[18] But the inference may be overcome by evidence in the record giving a satisfactory explanation, even when there is actual tampering. Indeed, one of the California cases upon which the appellant relies not only so states the rule, but holds, as the trial judge here did, that *the question is one for the jury.* To quote:

"The fabrication of evidence is calculated to raise a presumption against the party who has recourse to such practice, not less than when evidence has been suppressed or withheld. *It was for the jury to determine in what light defendant's testimony was to be considered.*"[19] (Emphasis added.)

The same principle was restated by another California Appellate Court in a later case:

"It may be conceded that it is the general rule that every presumption is against the despoiler of documentary evidence. This is true because the inference which arises from proof of intentional destruction is that the truth which would have conclusively appeared from the production of such evidence would have operated against the despoiler.

---

18. Wigmore on Evidence, 1940, 3rd Ed., Vol. 2, § 278; 31 C.J.S. Evidence, §§ 152, 153, 155.

19. Silva v. Northern California Power Co., 1916, 32 Cal.App. 139, 146, 162 P. 412, 415.

*Nevertheless, we know of no authority which declares that the presumption is conclusive.* Although evidence of the issuance of the certificates to the persons who claimed ownership of them and of their destruction by these individuals must necessarily have been clear, satisfactory, and convincing, the question of its quality and of whether it successfully measured up to this rigorous test was one that the trial court had to answer." [20]

This principle is recognized even in admiralty cases,[21] and has the approval of the Supreme Court of Washington.[22]

 In the light of these cases, the attempt of the appellant to turn this rebuttable presumption into a conclusive one, so as to base on it the contention that a directed verdict for the appellant should have been granted, finds no foundation in law.

So the trial judge was justified in denying the motion for a directed verdict based upon that ground and in declining to consider it as a basis for a judgment notwithstanding the verdict or for a new trial after the verdict.

 Equally without merit is the contention that the court erred in refusing to give instructions 20 and 21,

which are reproduced in the margin.[23] It is arguable whether the objection to these instructions sufficiently stated the grounds as required by the rules.[24] The objection to the failure to give the instructions merely stated that

"We believe they set forth a correct statement of the law in this case."

However, assuming the objection to have been adequate, the giving of the instructions was properly refused. They assumed that tampering with the evidence was present and that the tampering was done by the appellees.

Instruction No. 20, after stating the general rule with respect to inferences to be drawn from a party's tampering with, or his fabrication, of evidence, proceeded as follows:

"You are therefore further instructed that the changes or alterations in the ladder which occurred subsequent to the time of the accident on October 17, 1955, cast suspicion on the whole of the defense of Swiers and create a strong presumption that the ladder on the date of the accident was defective."

There was no evidence as to who did the tampering or as to who had access to the ladder between the first day of the

20. Tilton v. Iowa Oil Co., 1934, 139 Cal. App. 93, 97, 33 P.2d 446, 448.

21. The Silver Palm, 9 Cir., 1938, 94 F.2d 754, 762; The Ernest H. Meyer, 9 Cir., 1936, 84 F.2d 496, 503–504; Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 2 Cir., 1939, 102 F.2d 450, 453; Lykes Bros. Steamship Co. v. Union Carbide & Carbon Corp., 5 Cir., 1958, 253 F.2d 444, 448.

22. Walker v. Herke, 1944, 20 Wash.2d 239, 147 P.2d 255, 259–260.

23. "No. 20. You are instructed that a party's falsehood or other fraud in the preparation and presentation of his case, his fabrication, alteration and all similar conduct, is an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the case's lack of truth and merit. That inference
does not apply to any one fact in the case, but operates strongly against the whole mass of facts constituting his case.
"You are therefore further instructed that the changes or alterations in the ladder which occurred subsequent to the time of the accident on October 17, 1955, cast suspicion on the whole of the defense of Swiers and create a strong presumption that the ladder on the date of the accident was defective."
"No. 21. You are instructed that all efforts by a party to a suit, directly or indirectly, to destroy, alter, fabricate or suppress evidence is in the nature of an admission by such party that he has no sufficient case unless aided by suppressing evidence, or by the alteration or fabrication of more evidence."

24. Rule 51, Federal Rules of Civil Procedure.

trial, when the condition of the ladder was demonstrated to the jury, and a time, three days later, when it was testified that the bolts and nuts on the ladder had been tightened. The most that could be said would be that it was to the interest of the appellees to have the ladder tightened. But even if this were sufficient to permit an inference that the appellees did the tightening, yet it still would be a question for the jury to determine whether such was a fact. A proper instruction would, therefore, necessarily, have to tell the jury that an inference of alteration or tampering could be drawn *if* the jury first found that there was an alteration, and *if* it found that the appellees did it.

Instruction No. 21 was inadequate in that it did not inform the jury that if there was tampering with the evidence, it was a presumption which could be overcome by evidence in the record showing that there had been none.[25] If an instruction states the law incorrectly, it is not error to refuse to give it.[26]

In sum, the proffered on "tampering" instructions were improper and defective and the appellant's exception to the court's failure to give them was insufficient to put the court in error. Hence *they were properly rejected.*

IV

Other Asserted Errors

A. *Instructions Given.*

Error is asserted because the court instructed on contributory negligence, assumption of risk and unavoidable accident. The defenses of assumption of risk and contributory negligence were pleaded in the Answer. The contention that the accident was unavoidable was embodied in the pretrial Order.

Appellant concedes that the instructions given stated the law correctly and that the issues were presented by the pleadings, but insists that there was no evidence to which they related. Concededly, it is error to submit to a jury an issue as to which there is no evidence in the record.[27] By the same token, a party to an action is entitled to have his theory of the case presented to the jury by proper instructions, if there be any evidence to support it.[28]

The fallacy in the argument of the appellant lies in the assumption that her version of the accident, as given on direct examination, *must* be accepted. In an antecedent portion of this opinion, we referred to evidence in the record, in the light of which the jury could have discounted her version of the accident and the assertion that it was due to a defective ladder.[29]

25. See cases cited in Notes 18 and 20.

26. Vogreg v. Shepard Ambulance Co., 1955, 47 Wash.2d 659, 289 P.2d 350, 353. This is also the general rule. See 53 Am.Jur., Trial, § 512; 88 C.J.S. Trial § 391; Kelley v. City and County of San Francisco, 1943, 58 Cal.App.2d 872, 876, 137 P.2d 719; Sills v. Los Angeles Transit Lines, 1953, 40 Cal.2d 630, 633, 255 P.2d 795; Daniels v. City and County of San Francisco, 1953, 40 Cal.2d 614, 623, 255 P.2d 785; Gilbert v. Pessin Grocery Co., 1955, 132 Cal.App.2d 212, 222, 282 P.2d 148. Indeed, every trial judge is required to give such instructions. 53 Am.Jur., Trial, § 626. As stated in an old case:
"Correct instructions, if applicable to the case, the court, as a general rule, is required to give, unless the same are in substance and effect embodied in those previously given by the court to the jury." Insurance Company v. Baring, 1873, 20 Wall. 159, 161, 87 U.S. 159, 161, 22 L.Ed. 250.
See Ranney v. Barlow, 1884, 112 U.S. 207, 214, 5 S.Ct. 104, 28 L.Ed. 662; Montgomery v. Virginia Stage Lines, 1951, 89 U.S.App.D.C. 213, 191 F.2d 770, 772; Chicago, Rock Island & Pacific Ry. Co. v. Lint, 8 Cir., 1954, 217 F.2d 279, 285.

27. Rathke v. Roberts, 1949, 33 Wash.2d 858, 207 P.2d 716, 726; Leavitt v. De Young, 1953, 43 Wash.2d 701, 263 P.2d 592, 595.

28. Getzendaner v. United Pacific Insurance Co., Wash.1958, 322 P.2d 1089, 1094; Cantrill v. American Mail Line, 1952, 42 Wash.2d 590, 597, 257 P.2d 179, 185.

29. See Part II of this Opinion. Oral testimony, even in the absence of any "di-

Under Washington law, the assumption of risk is inherent in every contract of employment,[30] and it was the duty of the court to instruct the jury as to this doctrine, just as it was its duty to instruct the jury as to the obligation of the employer to furnish reasonably safe equipment.[31]

There is evidence in the record that there is a certain amount of risk in standing on the upper rungs of a ladder of this type. There is also evidence from which the inference could be drawn that the appellant fell because she reached out too far, thus unbalancing the ladder, or that the ladder may have been set too close to the apple boxes on the ground. One of the appellees' experts testified that the ladder

"could only be tipped over by improper setting or by leaning too far."

If the jury believed that either was the case, the appellant was guilty of contributory negligence.

As to the instruction on unavoidable accident, the Washington rule is that it may be given when facts are present from which an inference of unavoidable accident may be drawn.[32] There is evidence in the record from which the inference may be drawn that the appellant, standing rather high on the ladder, may simply have slipped and the weight of her body may have caused the ladder to tilt. If this be so, the conclusion would be warranted that the accident was an unavoidable one, of the type which happens to one slipping on a step and losing one's balance. So the giving of the instruction on the subject was proper.

When recalled as a witness in rebuttal, the appellant was asked specifically if, in using the ladder, she had noticed any kind of looseness that would indicate that the ladder had a defect. The questions and answers are given as they appear from the Transcript of Record, omitting the interruptions by counsel:

"Q. In your use of the ladder, while you were using it did you observe any looseness? A. I observed nothing that I felt would cause me to think that the ladder was, there was something wrong with it, no, I didn't.

"Q. And as you set the ladder and used it to pick apples during the course of that apple picking season up to the date of the accident, there was nothing up there that caused the ladder to be such that you felt unsafe on it? A. That ladder wasn't in continuous use with me.

\* \* \* \* \* \*

"Q. (By Mr. Splawn): While you were using the ladder was there any looseness of it that you observed at all? A. *I observed nothing to make me think that the ladder was not usable at that time, if it had been so, I would have told them.*

"Q. Well, during the time that you did use this ladder were you conscious of any looseness of the tongue or the top assembly? A. I hadn't observed it closely.

rect conflicting testimony", may be disregarded if it contains omissions or inconsistencies, is inherently implausible or improbable or is contradicted by the facts: Quock Ting v. United States, 1891, 140 U.S. 417, 420–421, 11 S.Ct. 733, 734, 35 L.Ed. 501; Grace Bros., Inc. v. C. I. R., 9 Cir., 1949, 173 F.2d 170, 176–178; Mitsugi Nishikawa v. Dulles, 9 Cir., 1956, 235 F.2d 135, 136, 140–141; Masters v. C. I. R., 3 Cir., 1957, 243 F.2d 335, 338; and see, Viles v. C. I. R., 6 Cir., 1956, 233 F.2d 376, 379; Hasson v. C. I. R., 6 Cir., 1956, 239 F.2d 778, 782; Anderson v. C. I. R., 5 Cir., 1957, 250 F.2d 242, 248.

30. See cases cited in Note 8.

31. See cases cited in Note 7. And see, Wehtje v. Porter, 1935, 183 Wash. 177, 179, 48 P.2d 212, 213.

32. Cantrill v. American Mail Line, supra Note 28, 257 P.2d at page 185; Brewer v. Berner, 1942, 15 Wash.2d 644, 131 P.2d 940; Barnes v. Labor Hall Association, Inc., 1957, 51 Wash.2d 421, 319 P. 2d 554, 557.

"Q. Well, were you aware of it? A. I knew it as we did every ladder we used that way.

"Q. Well, would you answer my question, please, Mrs. Wong. *Were you aware while you were using the ladder of it being loose at all in the top assembly?* A. *I was not aware of the looseness.*" (Emphasis added.)

If the jury took these statements *as an admission,* they could have found that there was no looseness in the ladder and that the accident may have been caused by something unforeseen such as the slip on a step to which we have referred, and which is not traceable to anyone's fault.

It should be added that in this case the appellees, by their pleadings and testimony, put in issue all the possible causations of the accident. In the circumstances, the three instructions were properly given.

B. *Alleged Misconduct of the Jury.*

▇▇▇▇ One other asserted error should be noticed. It is claimed that "with the verdict" there was handed to the Clerk a separate piece of paper addressing a question to the judge, which read:

"If we find in favor of the Wongs —were your instructions to the effect—that we were to consider her remaining 25 years and 77 days for a method of compensation—Yes or No."

An affidavit in the record, filed on the motion for a new trial, which is uncontradicted, states that this was not handed in with the verdict, but was handed to the bailiff some forty-five minutes before the jury returned its verdict. If, —as appellant asserts—the statement was handed in "with the verdict", it was

incumbent upon her to raise the point as to the regularity of the verdict at the time when it was returned with the question attached to it, and before the jury was discharged. Had this been done, the Court could have sent the jury out with instructions to clarify the verdict. The right of the court to do so, on motion of a party or on its own motion, is generally recognized.[33] The appellant not having done so, it was too late to raise the point thereafter. And she is not in a position to argue *now* that this inquiry is an indication that the jury misunderstood the instructions.

A jury cannot impeach its own verdict in this manner.[34] Nor can this inquiry be considered a special verdict so as to invalidate the general verdict for the appellees, under Rule 49(b), Federal Rules of Civil Procedure. One can only surmise that, at one stage of the jury's deliberations, while they were discussing the question of liability, the problem of damages came up and the jury may have sought clarification as to the criteria by which to determine the general damages. No doubt, during the interim between this discussion and the time when the verdict was reached, the jury had determined the matter of liability adversely to the appellant. The question of the measure of damages then became unimportant. At best, the inquiry of the jury is too insignificant an occurrence to warrant us in speculating what may have motivated them in making it, and at what stage it was made, so as to upset a judgment which, in our view, presents no reversible error.

We are mindful of the statutory injunction to disregard

"errors or defects which do not affect the substantial rights of the parties."[35]

We find this to be the situation here.

The judgment is affirmed.

---

33. 89 C.J.S. Trial § 567(b); 53 Am.Jur., Trial, § 1099.

34. 53 Am.Jur., Trial, §§ 1105, 1106; 89 C.J.S. Trial § 523.

35. 28 U.S.C. § 2111.