**Vernon Lee BRAY, Plaintiff-Appellee,**

v.

**YELLOW FREIGHT SYSTEM, INC., and William G. Reffett, Defendants-Appellants.**

**YELLOW FREIGHT SYSTEM, INC., Plaintiff-Appellant,**

v.

**Vernon Lee BRAY, Individual, and Braafladt Transport Co., Defendants-Appellees.**

**No. 72-1796.**

United States Court of Appeals, Tenth Circuit.

July 30, 1973.

Rehearing Denied Sept. 6, 1973.

John F. Wheatley, Yukon, Okl., for Vernon Lee Bray.

Donald G. Hopkins, Tulsa, Okl. (M. Darwin Kirk and Rucker, Tabor, Mc-Bride & Hopkins, Tulsa, Okl., on the briefs), for defendants-appellants.

Before PHILLIPS, SETH and McWILLIAMS, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

This is a diversity action brought by Bray against Yellow Freight System, Inc.,[1] and William G. Reffett to recover damages resulting from a collision which occurred on Interstate Highway 40 at about 2:45 p. m. on August 11, 1970.

The jury returned a verdict for $75,000 in favor of Bray and against Freight System and Reffett. From a judgment entered thereon, Freight System and Reffett have appealed.

At the trial, evidence was adduced, which, with the inferences reasonably deductible therefrom, was amply sufficient to support the finding by the jury of the following facts:

Freight System was the owner of a truck tractor and two trailers, which at the time of the collision was being driven by Reffett as its employee.

At the time of the collision, Bray was the owner of a truck tractor and was driving it as a contract carrier by motor vehicle[2] for Braafladt Transport Company,[3] and there was attached to

---

1. Hereinafter referred to as Freight System.

2. 49 U.S.C.A. § 303(a)(15) in part here pertinent reads:
 "(15) The term 'contract carrier by 'motor vehicle' means any person which engages in transportation by motor vehicle of * * * property in interstate * * * commerce, for compensation (other than transportation referred to in paragraph (14) of this subsection * * *), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor ve-

hicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."
 Paragraph (14), supra, in part here pertinent reads:
 "(14) The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate * * * commerce of * * * property or any class or classes thereof for compensation, whether over regular or irregular routes, * * *."

3. Hereinafter referred to as Braafladt.

such tractor a tank trailer belonging to Braafladt.

Under the arrangement with Braafladt, Bray was to furnish his tractor to Braafladt to transport anhydrous ammonia in its tank trailer either from Sharon, Oklahoma, or Shamrock, Oklahoma, where it purchased such ammonia, to purchasers thereof from Braafladt. Also, under such arrangement, Bray was to drive such tractor and pay all the operating expenses thereof, including gas and oil and the replacement of tires and other needed parts. Braafladt was also required to secure and pay for all needed permits, and was to pay Bray 65 per cent of the freight. The record does not show how the amount of freight was arrived at, but we may assume that whatever the basis for it was, it was added to the purchase price and collected by Braafladt.

Bray operated under such arrangement for a period of three weeks immediately prior to the collision, and after deducting all expenses of operation of the tractor, realized a net of $695, or $231.66 per week therefrom.

The collision was between the rear of the rear trailer of Freight System and the front end of Bray's tractor. We will show the exact places of contact later.

Bray had been driving a highway truck since 1926, which was most of his active life. He had been employed as a tractor truck driver in interstate commerce for Groendyke of Enid, Oklahoma, for a period of 16 years, which employment was voluntarily ended by him shortly before he entered the business of contract carrier.

To be authorized to drive a truck tractor in interstate commerce, Bray was required by regulation duly adopted and promulgated by the Secretary of Transportation to take and pass a physical examination.[4] He took and passed such examination about January 1, 1970.

On August 10, 1970, Bray unloaded a cargo of ammonia for a purchaser from Braafladt at Pond Creek, Oklahoma, and then proceeded to Seiling, Oklahoma, where he took an eight-hour break, during which he slept six hours. He got up at about 10 p. m. and proceeded to Etter, Texas, arriving there at 2 a. m. on August 11, 1970. He there obtained another load of ammonia. At about 2:30 a. m. on August 11, 1970, he left Etter and proceeded to Dumas, Texas, where he stopped and slept for two hours. He then proceeded to El Reno, Oklahoma, where he delivered the second load of ammonia to a purchaser from Braafladt. He had a tire repaired and ate a meal at El Reno and then started his return trip to Amarillo. While he was so en route, the collision occurred.

The Cherokee truck stop is located on Interstate Highway 40, about two miles east of the point where the collision occurred.

Bray suffered a concussion as a result of the collision, and remembered nothing that occurred from shortly after he passed such truck stop until he awakened in the General Hospital at Clinton, Oklahoma, where he had been taken by ambulance following the collision.

Bray was not sleepy at the time he approached the truck stop, nor when he passed it. He had had eight hours' sleep in the 24 hours immediately before the time of the collision.

Before he suffered his lapse of memory, he observed that the traffic was very heavy in both the right and left westbound lanes of Interstate Highway 40, and that it was so heavy in the left lane that it was crowded in that lane.

In August 1970, Bray had ulcers and took antiacid tablets on the advice of his doctor. However, the ulcers did not in any degree affect his ability to properly drive a truck tractor.

On the day of the collision, Reffett was driving Freight System's tractor,

4. See National Traffic and Motor Vehicle Safety Act of 1966, Pub.L. 89–563, 80 Stat. 718, 15 U.S.C.A. § 1381 et seq.

and it was hauling two trailers attached thereto. On that day, he drove from Baxter Springs, Kansas, and was on his way to Amarillo, Texas. He had proceeded on Highway 66 to Afton, Oklahoma, then on the Will Rogers Turnpike to Tulsa, Oklahoma, then on the Turner Turnpike to Interstate Highway 40, and on the latter highway to a point 2.8 miles east of Clinton, Oklahoma.

Freight System maintained a tire bank at Clinton, Oklahoma, and at a point about 2.8 miles east of Clinton Reffett pulled off of the traveled portion of the highway onto the shoulder of the road and parked in order to check his tires. After he had checked his tires and found they did not need repair or replacement, Reffett released his brakes, turned on his signal light to indicate a left turn, and proceeded west for a distance of 90 to 100 yards on such shoulder.

Reffett testified that when he first started to drive onto the shoulder of the highway, he looked back and could see Bray's truck coming from the east. He further testified that when he reached a point on the shoulder of the road about 90 or 100 yards from where he parked his tractor and trailers to examine his tires, he moved onto the traveled portion of the right westbound lane of the highway until his tractor and trailers were two and one-half to three feet to the left of a white line which marked the edge of the traveled portion of the right westbound lane, and that when he started to turn onto such traveled portion Bray's tractor and trailer were only about 100 yards behind him.

Reffett realized, as was clearly shown by his own testimony, that when he turned onto the traveled portion of the highway the distance between his rear trailer and Bray's tractor was insufficient for him to safely enter the traveled portion of the right westbound lane, and he relied on Bray to turn his tractor and trailer into the left westbound lane.

Reffett further testified that with his tractor and trailers occupying about three feet of the traveled portion of the right westbound lane and the remainder thereof on the shoulder of the highway, he continued west at a speed of 25 miles per hour for a distance of about 100 yards, and that when Bray reached a point about 40 feet east of his rear trailer, he decided Bray was not going to turn into the left westbound lane, and for that reason decided to turn off of the traveled portion of the right westbound lane onto the shoulder of the highway.

Reffett further testified that when he started to turn back onto the shoulder of the highway, he did not see Bray's tractor and trailer again, because he was busy trying to steer his tractor and trailers back onto the shoulder of the highway.

Reffett admitted that the traffic was heavy in both the left and right westbound lanes when he started to drive along the shoulder of the highway, and that motor vehicles passed him as he traveled on the shoulder of the highway.

James Sawyer, an Oklahoma Highway Patrolman, investigated the accident and testified at the trial. There was a Highway Patrol Headquarters at Clinton, and Sawyer was stationed there. He was well qualified by courses he had taken at the Oklahoma Highway Patrol School and by experience in investigating highway accidents.

He received notice of the collision at such headquarters at 2:54 p. m. on August 11, 1970. He arrived at the scene of the collision about 3 p. m. The accident occurred 2.8 miles east of the city limits of Clinton.

Sawyer testified in detail as to the damage to Reffett's tractor and trailers and to Bray's tractor and trailer. He said the westbound lanes of the highway were blocked by the different parts of the vehicles of Reffett and Bray, and

motor vehicles were backed up seven to eight tenths of a mile east of the collision.

He also testified that it was vacation time, and that the traffic on Interstate Highway 40 was very heavy. He said he saw no skid marks east of the point of impact. He further testified that Bray was driving in his proper lane of traffic when the collision occurred and that he found no evidence of excessive speed.

He further testified that the highway passed under an overpass located 140 feet west of the point of impact, and that it was nearly impossible for trucks the size of Reffett's tractor and trailers to pass under the overpass without a portion of them being in that part of the westbound lane south of the white line, because the roof of the overpass tapered down from its center outward.

Reffett testified he believed he could have passed under the overpass without driving on a portion of the right westbound lane, but frankly admitted that he would not have attempted so to do.

Sawyer testified that shortly after his arrival at the scene of the collision an ambulance arrived, and that they loaded Bray into the ambulance and he was taken to the hospital at Clinton; that Bray was unable to talk, and that Bray had been "slung down the highway" for a distance of 100 feet.

Basing his conclusion on the location of the place of impact, Sawyer estimated that at the time of the impact the north side of Reffett's rear trailer was two feet south of the white line which marked the north edge of the right westbound lane. Further basing his conclusion on the place of impact, Sawyer estimated that the south side of Reffett's rear trailer was nine and one-half feet north of the dividing line between the left and right westbound lanes. From the foregoing, he further concluded that there was room left for Bray's trailer, which was seven feet, four inches in width, to have passed between Reffett's rear trailer and such dividing line.

But Reffett testified that when he started to turn out on the shoulder of the highway, the left side of his rear trailer was two and one-half to three feet to the left of such white line, and Bray's tractor was then only 40 feet to the rear of Reffett's rear trailer. Hence, Reffett's own evidence showed that the clearance between his rear trailer and such dividing line was nine feet, instead of nine and one-half feet, and might have been as little as eight and one-half feet.

Moreover, Bray would have had to get his tractor and trailer lined up parallel with such dividing line before he could attempt to pass between Reffett's vehicle and such dividing line, and he had only 40 feet and very few seconds to so align his tractor and trailer.

■ Moreover, until Reffett started to turn back onto the shoulder of the highway, Bray had the right to assume that Reffett would continue on the course where two and one-half to three feet of his vehicles were south of the white line marking the north edge of the right westbound lane, until he had passed under the overpass.

47 Okl.St.Anno. § 11–603 provides:

"No person shall start a vehicle which is stopped, standing or parked unless and until such movement can be made with reasonable safety."

■ Reffett's own testimony clearly shows that he violated such statute and was guilty of negligence *per se.*

That brings us to the claims of Freight System and Reffett that Bray was guilty of contributory negligence as a matter of law, and in the alternative, that Bray was guilty of negligence which was the proximate cause of the collision.

■ Reffett and Freight System claim that Bray was guilty of negligence

in failing to pass Reffett's tractor and trailers in the right westbound lane. We doubt that under the undisputed facts, a man of ordinary prudence would have attempted to pass Reffett's tractor and trailers in the right westbound lane, but giving Reffett and Freight System the benefit of the doubt, we think it is at least clear that under the evidence and the inferences reasonably deductible therefrom, the minds of reasonable men might reach different conclusions as to whether Bray should have attempted to pass Reffett's tractor and trailers in the space between them and the center line of the two westbound lanes.[5] We conclude that whether Bray should have so attempted to pass Reffett's outfit was a question of fact for the jury.

 Counsel for Reffett and Freight System also contend that Bray was guilty of contributory negligence or primary negligence, which was the proximate cause of the collision, because of his failure to turn into the left westbound lane and yield the right of way to Reffett. The evidence clearly shows that on the afternoon of August 11, 1970, the traffic was heavy in both the right and left westbound lanes of the highway, and that it was so heavy in the left westbound lane that it was crowded.

A number of motor vehicles traveling west passed Reffett as he drove on the shoulder of the highway, and also when he drove in part of the right westbound lane. Reffett testified that he first saw Bray's truck in the right westbound lane just before he started to move along the shoulder of the highway, and that Bray was then 150 yards to his rear. He further testified that when he turned from the shoulder of the highway partially into the right westbound lane, Bray was 100 yards to his rear, and that when he turned into such westbound lane he relied on Bray's turning his tractor and trailer into the left westbound lane and yielding the right of way to him.

Had Reffett looked back in his rear vision mirror from the shoulder of the highway and before he entered the westbound lane, Bray's tractor and trailer would have shut off his view of a passenger motor vehicle traveling closely behind Bray in the left westbound lane, and until the passenger vehicle cleared Bray's tractor and trailer it would not have been safe for Bray to turn into the left westbound lane.

Whether, under the evidence, there was a time when Bray could have safely turned from the right into the left westbound lane, after Reffett had started to move from where he was parked along the shoulder of the highway, and passed Reffett's tractor and trailers is doubtful. It at least presents a question with respect to which the minds of reasonable men might reach different conclusions, and if so, it was an issue of fact which was properly submitted to the jury. (See cases cited in Note 5.)

 Reffett and Freight System assert that Bray was guilty of contributory negligence in not applying his brakes and slowing down his speed. They base their statement that Bray did not apply his brakes on the statement of the Highway Patrolman that there were no skid marks east of the point of impact. There is no evidence in the record that Bray did not apply his brakes prior to the collision. To have set his brakes so hard that they would have locked the wheels and caused skid marks would have been foolhardy. Bray was traveling 60 miles per hour, and to so apply his brakes could have caused his tractor and trailer to jackknife or to swerve into the traffic in the left westbound lane.

Moreover, Reffett testified that when he started to turn back onto the shoulder of the highway, he was so busy making the turn that he did not look in his rear vision mirror, and did not see Bray from the time he started to turn off un-

5. See Central Surety & Ins. Corp. v. Murphy, 10 Cir., 103 F.2d 117, 119; Larson v. Tri-City Electric Service Co., 7 Cir., 132 F.2d 693, 697; Terry v. Mul-

ler, 8 Cir., 190 F.2d 170, 172; United States v. Bemis, 9 Cir., 107 F.2d 894, 897; Stueber v. Admiral Corporation, 7 Cir., 171 F.2d 777, 779.

til after the collision. We are of the opinion that there was no evidence which would have justified the court in holding that Bray was guilty of contributory negligence as a matter of law in failing to apply his brakes.

We have purposely refrained from setting out the pertinent facts as to the damages suffered by Bray, because we think it will render the opinion more readily understandable when we discuss the issues as to damages, which we now proceed to do.

We start with the premise that the court properly submitted to the jury the issue of whether Bray was guilty of contributory negligence or of primary negligence, which was the proximate cause of the collision, and that the jury found in favor of Bray on that issue.

It was stipulated that Bray expended $3,000 for medical and hospital expenses and suffered damages to his property of $4,500, or an aggregate of $7,500.

. The question then is whether the evidence of personal injuries and pain and suffering suffered by Bray, and the capacity to earn lost by Bray as the result of Reffett's negligence, was sufficient to sustain an award of damages in the amount of $67,500.

As the proximate result of the collision, Bray suffered extensive, severe and very painful injuries. He suffered cuts, bruises, and abrasions all over his body. The palms of his hands and the bottoms of his feet were severely burned from sliding a long distance on the rough payment when he was thrown from the cab of his truck as a result of the collision.

He was taken by ambulance from the place of the collision to the emergency room at the Oklahoma General Hospital at Clinton, Oklahoma. On his arrival at the emergency room of the hospital at about 3:15 p. m. on August 11, 1970, he was examined by Dr. Paul B. Lingenfelter, who did general surgery and specialized in chest surgery.

Dr. Lingenfelter testified to the following facts:

Bray was in moderate shock on his arrival, was bleeding, and needed blood transfusions. He had scalp lacerations and multiple lacerations of the face, which were disfiguring and would require plastic surgery. He also had multiple lacerations of his arms and legs. He had fractures of the seventh, eighth, and ninth ribs on the right side of his chest. The broken ends of the ribs were sharp and had punctured the right lung. He had contusions of the right lung, and hemorrhaged from the lung and pleura inside the chest wall. He had a pneumothorax, which is air in the right chest space, and fluid in the base. He also had a fracture and downward movement of his left checkbone, which had to be reduced and put into proper position by a surgical procedure. He had a concussion of the brain and was semiconscious. He was unable to remember what happened to him. Dr. Lingenfelter testified that his concussion could have caused his loss of memory from a time shortly before the collision up to the time he was received at the hospital.

Bray was given tetanus injections and antibiotics. Dr. Lingenfelter did a very extensive repair job on the lacerations on his face. The cuts were irregular and ragged and required repairs by restoring the various anatomical portions to their normal position, which required three layers of sutures. Repairs also had to be made of the scalp, leg, and arm wounds. Dr. Lingenfelter made the needed repairs while Bray was still in the emergency room. Bray was then removed to a bed in the hospital. He was given treatment for shock. An elastic belt was placed around his chest wall to hold the broken ribs in proper position.

On August 21, 1970, Bray was transferred from the Clinton Hospital to St. Anthony's Hospital at Amarillo, Texas.

Medication for relief from pain was given to Bray during the time he was in

such hospitals, and also for a substantial time thereafter. He was troubled by shortness of breath and was fitted with a rib belt to enable him to breath better. He wore the belt for approximately two months after he left St. Anthony's Hospital, but was still troubled with shortness of breath on slight exertion at the time of the trial.

As a proximate result of the collision, Bray suffered severe trauma of his shoulders. That caused a restriction from normal of the distance he could raise his arms and the distance he could move his neck. Such restriction continued, although on the advice of the doctor he had taken regular exercises to relieve it. If he tried to move his arms beyond the point of restriction, he suffered severe pain. He also suffered pain if he attempted to turn his neck beyond the point of restriction.

Bray was discharged from St. Anthony's Hospital on September 5, 1970. Dr. Lonnie C. Redus, who was Bray's attending physician after he was removed to St. Anthony's Hospital, examined him on June 12, 1972, two days before he gave his deposition, which was introduced at the trial. He testified to the following facts:

Bray still had limited motion of his neck and could not turn his head more than 20°, while 45° to 90° was normal. Bray was unable to raise his arms above his head. He was barely able to get them up to a 90° angle. He had a marked decrease in motion in both shoulders, which was the result of a great amount of trauma he received in his neck and shoulders at the time of the collision. There was a fairly large amount of callus on the ribs which had been broken, and the rib cage was tender to the touch.

As noted above, on about January 1, 1970, Bray took and passed the physical examination required by the United States Government for one to drive a truck in interstate commerce, but the injuries received by him at the time of the collision rendered it impossible for him to drive a truck or engage in any type of hard labor.

Bray testified that he was still short of breath at the time of the trial, on very slight exertion, and that he continued to suffer from the limitation of motion of his shoulders, arms and neck, as testified to by Dr. Redus in his deposition. He further testified that he continued to suffer from pain.

At the pretrial conference, the parties stipulated that at the time of the accident Bray had a life expectancy of 14.78 years.

Bray further testified that when he left Groendyke he purchased a tractor and rented a trailer, and that for three weeks before the collision he had engaged in transporting goods for hire in interstate commerce on a contract basis; that during those three weeks he had realized a net profit of $625, and that based on his experience in the trucking business, he would have been able in a short time to build such business up to where he would have realized a net profit of $250 per week, had he not suffered the physical injuries caused by the collision.

Damages suffered from personal injuries and pain and suffering, nor ordinarily from loss of capacity to earn, cannot be established with mathematical certainty.[6]

In A to Z Rental, Inc. v. Wilson, 10 Cir., 413 F.2d 899, at 908, the court said:

"When the cause and existence of damages have been established with the requisite certainty, recovery will not be denied because the amount of

6. Kurn v. Manley, 194 Okl. 574, 153 P.2d 623, 627; Oklahoma Ry. Co. v. Alexander, 205 Okl. 691, 240 P.2d 742, 744; Spicers, Inc. v. Rudd, 199 Okl. 576, 188 P.2d 692, 695; Denco Bus Lines v. Hargis, 204 Okl. 339, 229 P.2d 560, 563; Chicago, Rock Island and Pacific R. Co. v. Hawes, Okl., 424 P.2d 6, 15.

**508**

such damages is difficult of ascertainment.

"The rule which precludes the recovery of uncertain damages applies to those that are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect to that amount.

"In Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, at 265, 66 S.Ct. 574, at 580, 90 L.Ed. 652, the court said:

" 'The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'

" * * * A reasonable basis for computation and the best evidence obtainable under the circumstances of the case and which will enable the trier of the facts to arrive at a fairly approximate estimate of the loss is sufficient." [7]

The injuries suffered by Bray, the pain he suffered therefrom, the partial disability he temporarily suffered, and the partial permanent disabilities he suffered from such injuries were fully and clearly established by the evidence. We are of the opinion that such evidence was amply sufficient to enable the jury to arrive at a fairly approximate estimate thereof, measured in dollars.

We also believe that the evidence of Bray as to the loss of capacity to earn, based on his long experience in the driving of trucks, his knowledge of the trucking business in the vicinity, where he intended to carry on the business of contract carrier, his experience and earnings as a contract carrier during the three weeks preceding the collision, and the net amount he was able to earn as the operator of a service station, where he had to hire employees to do practically all of the labor, was the best evidence obtainable and was sufficient to enable the jury to arrive at a fairly approximate estimate of the damage he suffered from the loss of his capacity to earn.

We are of the opinion that the evidence was amply sufficient to support an award of $67,500, in addition to $3,000 for medical and hospital expenses and $4,500 for property damage, even though the award for pain and suffering was limited to $30,000, the amount prayed for in the complaint.

We conclude that the claims of error made by Freight System and Reffett were not well founded, and the judgment is therefore

Affirmed.

**7.** See also Woodburn Brothers v. Erickson, 10 Cir., 230 F.2d 240, 242; Baer Bros. Land & Cattle Co. v. Palmer, 10 Cir., 158 F.2d 278, 280; Hoffer Oil Corporation v. Carpenter, 10 Cir., 34 F.2d 589, 592; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544; Indian Territory Illuminating Oil Co. v. Townley, 10 Cir., 81 F.2d 159, 160; Vanguard Ins. Co. v. Connett, 10 Cir., 270 F.2d 868, 870; T. F. Scholes, Inc. v. United States ex rel. H. W. Moore Equipment Co., 10 Cir., 295 F.2d 366, 369, 370; Larrance Tank Corporation v. Burrough, Okl., 476 P.2d 346, 350; City of Holdenville v. Griggs, Okl., 411 P.2d 521, 526; Oklahoma Transportation Company v. Hays, Okl., 405 P.2d 181, 184.